UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

ANTHONY ORTIZ,                                          :

                                                        **<u>AMENDED</u>**
                              Plaintiff,     :          **<u>DECLARATION</u>**

              -against-                      :          12 CV 5372 (JMF)

THE CITY OF NEW YORK;
THE NEW YORK CITY HOUSING AUTHORITY; :
JAMES THEIS, a former detective employed
by the New York City Police Department,
JOHN DOE Nos. 1 through 5 (whose identities are     :
currently unknown but who are known to have been
detectives and supervisors with the New York City
Police Department), and MICHAEL CODELLA (aka :
"Rambo"), a former detective with the New York
City Housing Authority Police Department,
as individuals and in their official capacities,     :

                              Defendants.     :

-----------------------------------------------------------------X

     JOEL B. RUDIN, an attorney duly admitted to practice law before this

Court, hereby declares under the penalty of perjury that the following is true:

     1.     I am the attorney for Plaintiff Anthony Ortiz and submit this

declaration in support of Plaintiff's motion for an order pursuant to 28 U.S.C. §

1447 (c), remanding this action back to the Supreme Court, Bronx County, due to

defendants' failure to obtain from all properly-served defendants consent to

remove this action to this Court.

## THE RELEVANT FACTS

2.      Plaintiff commenced this action in the Bronx Supreme Court, on June 25, 2012. *Ortiz v. City of New York*, Bronx Co. Index No. 305498/12 (Schachner, J.). *See* Ex. A.

3.      Individual defendant James Theis was personally served with the summons and complaint on July 11, 2012. *See* Corrected Affidavit of Service annexed as Ex. B. Codella was served on July 9, 2012. *See* Ex. C. Under New York law, service is complete the moment the summons and complaint are "deliver[ed]" to the defendant. *Palladino v Sargent*, 6 A.D.3d 1082, 1084 (4th Dep't 2004).

4.      On July 12, 2012, the City removed the action to this Court pursuant to 28 U.S.C. §§ 1331, 1367(a) and 1441. *See* Ex. D. Attached as an exhibit to the City's papers was an affidavit from New York City Housing Authority's ("NYCHA") attorney Patrick J. Lawless consenting to removal. *Id.* However, the City erroneously claimed that, among other things, Theis had not been served with the summons and complaint, *see* Ex. D, Affid of Eric H. West, July 11, 2012, ¶ 12, when, in fact, he had been so served.

5.      On July 23, 2012, the City filed an amended notice of removal. *See*

2

Exh E. In addition to the NYCHA's consent, the City's amended notice of removal included Codella's written consent to removal. *Id.* However, once again, the amended notice *did not* include any consent by Theis. Instead, the City once again erroneously claimed that "[u]pon information and belief...JAMES THEIS...has not been served a copy of the Complaint" at the time the notice of removal had been filed. Ex. E, Affid of Eric H. West, July 23, 2012, ¶ 14. Plaintiff had filed an affidavit of service upon Theis on July 19, 2012. Ex. F

6.     Under 28 U.S.C. § 1446 (b) (2) (B), Theis had 30 days from the date he was served, July 11, 2012, to file his own notice of removal or consent to the City's notice, *i.e.*, until today, August 10, 2012. Theis failed to do so and thus the City's notice of removal, lacking Theis' consent, is defective and, as a matter of law, this action must be remanded to state court.

WHEREFORE, Plaintiff respectfully requests that this Court remand this action to the Bronx Supreme Court, and for such further relief as this Court deems just and proper.

_____
JOEL B. RUDIN

AFFIRMED:     New York, New York
              August 13, 2012

# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX

---------------------------------------------------------------X

ANTHONY ORTIZ,

                    Plaintiff,       :   **SUMMONS**

             -against-          :   Index No. 305498/12

THE CITY OF NEW YORK;                Venue: <u>Bronx County</u>
THE NEW YORK CITY HOUSING AUTHORITY;  :   (Jury Trial Demanded)
JAMES THEIS, a former detective employed
by the New York City Police Department,
JOHN DOE Nos. 1 through 5 (whose identities are
currently unknown but who are known to have been
detectives and supervisors with the New York City
Police Department), and MICHAEL CODELLA (aka
"Rambo"), a former detective with the New York
City Housing Authority Police Department,
as individuals and in their official capacities,   :

               Defendants.    :

---------------------------------------------------------------X

To the above-named defendants:

    YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a copy of your answer, or if the complaint is not served with this summons, to serve a notice of appearance, on the plaintiff's attorney within twenty (20) days after service of this summons, exclusive of the day of service (or within thirty [30] days after service is complete if this summons is not personally delivered to you within the State of New York). In the case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint

    The basis of the venue designated is Bronx County because it is where the cause of action arose and because of Plaintiff's designation.

DATED:   New York, New York
         June 25, 2012

BY: JOEL B. RUDIN, ESQ. (JR 5645)
200 West 57th Street, Suite 900
New York, New York 10019
(212) 752-7600
Email: jbrudin@aol.com

*ATTORNEY FOR THE PLAINTIFF*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX

----------------------------------------------------------------X

ANTHONY ORTIZ,                                    :

                                Plaintiff,       :    **<u>COMPLAINT</u>**

                         -against-       :    Index No. 305498/12

THE CITY OF NEW YORK;
THE NEW YORK CITY HOUSING AUTHORITY;  :  **<u>Jury Trial Demanded</u>**
JAMES THEIS, a former detective employed
by the New York City Police Department,
JOHN DOE Nos. 1 through 5 (whose identities are
currently unknown but who are known to have been
detectives and supervisors with the New York City
Police Department), and MICHAEL CODELLA (aka
"Rambo"), a former detective with the New York
City Housing Authority Police Department,
as individuals and in their official capacities,    :

                        Defendants.    :

----------------------------------------------------------------X

Plaintiff ANTHONY ORTIZ ("Plaintiff"), by his attorneys, the LAW OFFICES OF JOEL

B. RUDIN, complaining of the Defendants, respectfully alleges, upon information and belief, as

follows:

## NATURE OF ACTION

1.     This is a civil action, pursuant to 42 U.S.C. §1983 and 1988, and New York State

law, seeking monetary damages for Plaintiff, ANTHONY ORTIZ, due to his malicious

prosecution, wrongful conviction, and nearly 20-year imprisonment – all caused by the pervasive

misconduct of New York police detectives and an assistant district attorney.

2.     The underlying crime, a drive-by, drug-related ambush and double homicide on

the Lower East Side of Manhattan, occurred on December 8, 1989, during a period of frequent, drug-related violence in New York City. Police detectives, including defendants JAMES THEIS and ANTHONY CODELLA, were determined to "close" this and other open cases with arrests, whether they charged the true culprit, or not. They told Plaintiff, then just 19 years of age, that if he did not "cooperate" by implicating other individuals they suspected of involvement in such incidents, he would be arrested and prosecuted for the double murder even though they knew he was not involved in its commission. When Plaintiff refused to become an informant, they made good on their promise. During Plaintiff's prosecution, these and other detectives withheld from the District Attorney's Office evidence favorable to Plaintiff, known as *Brady* material, which they knew they were constitutionally required to disclose, thereby substantially contributing to Plaintiff's wrongful conviction.

3. Plaintiff also was unlawfully convicted due to the misconduct of an overzealous assistant district attorney who was assigned to his case ["the assigned ADA"]. In violation of Plaintiff's constitutional right to due process of law and a fair trial, this ADA knowingly presented false testimony by key witnesses, and improperly vouched for the "truthfulness" of their testimony as an unsworn "witness," when she knew they were testifying untruthfully and she was simultaneously withholding from Plaintiff evidence and information she was constitutionally required to disclose which would have dramatically impeached their credibility and made an acquittal highly probable.

4. On November 19, 2009, over the strenuous opposition of the Manhattan District Attorney's Office, the New York Court of Appeals vacated Plaintiff's conviction and ordered a new trial. The Court found that the prosecutor's misconduct had caused Plaintiff's conviction in

violation of his federally-protected due process rights. Ultimately, on June 29, 2011, the D.A.'s office, admitting it had no evidence with which to prove its case, finally agreed to dismiss the indictment. Plaintiff served more than 18 years in prison on account of his wrongful prosecution and conviction in this case.

5. This lawsuit seeks to hold liable the individual police detectives responsible for Plaintiff's false prosecution, as well as the defendants CITY OF NEW YORK and NEW YORK CITY HOUSING AUTHORITY ("NYCHA"). These entitles are liable under the federal civil rights statute, 42 U.S.C. § 1983, and *Monell v. Dept. of Social* Services, 436 U.S. 658 (1978), because their unlawful policies, customs, or practices, or deliberate indifference to such policies, customs, or practices, were a substantial cause of Plaintiff's constitutional injuries. Defendant CITY also is liable under the principle of *respondeat superior* and for its negligent hiring, training, supervision and discipline of its personnel, including the aforementioned actors, regarding their constitutional duties.

## JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

6. This action arises under 42 U.S.C. §§ 1983 and 1988, and under the common law of the State of New York.

7. Venue is proper in this County because it is where the cause of action arose and because of Plaintiff's designation.

8. On September 23, 2011, Plaintiff served upon Defendant City of New York timely notice of the present claims pursuant to New York General Municipal Law § 50-e.[1]

---

[1]A Notice of Claim was not served upon the NYCHA. A motion for permission to file a late notice of claim is pending before the court.

A hearing pursuant to New York General Municipal Law § 50-h was held on January 25, 2012.

9.     This action has been commenced within one year of the accrual of Plaintiff's causes of action.

10.     Plaintiff has duly complied with all of the conditions precedent to the commencement of this action.

<u>**THE PARTIES**</u>

11.     Plaintiff, ANTHONY ORTIZ, is a citizen and resident of the State of New York.

12.     Defendant, the CITY OF NEW YORK ("Defendant City"), is a municipal corporation existing by virtue of the laws of the State of New York. The New York City Police Department ("NYPD") is an agency of the City of New York, which is liable for its torts and those committed by its employees within the scope of their employment.

13.     Defendant, the NYCHA, is a municipal corporation existing by virtue of the laws of the State of New York. At all relevant times prior to 1995, the NYCHA maintained its own police force whose principal function was to enforce criminal and administrative laws and rules in and about properties and buildings owned or operated by the NYCHA.

14.     Defendant, JAMES THEIS, is a retired detective who was employed by the NYPD. At all times relevant to this Complaint, he acted toward Plaintiff under color of the statutes, ordinances, customs, and usage of the State of New York and the City of New York, and within the scope of his employment. He is sued in his individual and his official capacities.

15.     Defendant, MICHAEL CODELLA (aka "Rambo"), is a retired police officer who was employed by the NYCHA. He also was assigned, during periods relevant to this Complaint, to a joint State-Federal narcotics prosecution task force. In connection with his duties, from time

4

to time he worked under the supervision of NYPD personnel. At all times relevant to this Complaint, he acted toward Plaintiff under color of the statutes, ordinances, customs, and usage of the State of New York and the City of New York, and within the scope of his employment. He is sued in his individual and his official capacities.

16. Defendants JOHN DOE Nos. 1 through 5, were detectives and/or supervisors employed by the NYPD or the NYCHA. At all times relevant to this Complaint, they acted toward Plaintiff under color of the statutes, ordinances, customs, and usage of the State of New York and the City of New York, and within the scope of their employment. They are sued in their individual and their official capacities.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### A.    The Crime, The Initial Investigation, and Plaintiff's Arrest

17. On December 8, 1989, near the corner of East 4th Street and the FDR service road in Manhattan, a group of men allegedly driving by in a van opened fire on two occupied parked cars, killing two men, Orlando Martin and Frank Morales, and severely wounding two others, Pedro Mejia and Rafael Garcia ("the FDR murders").

18. The brutal incident was widely covered in the news media, and rumors quickly spread in the neighborhood that Wilbur and Billy Hernandez ("the Hernandez brothers"), Willie Perez, and Johnny "Moose" Vargas, all known to be violence-prone drug dealers, were responsible.

19. Defendant THEIS, then assigned to the Ninth Precinct Homicide Squad, was placed in charge of the investigation.

20. THEIS and other detectives immediately suspected that the shooting was drug-

related, as all of the victims except Morales were known drug dealers.

21.     THEIS suspected that the mastermind was one of the most powerful drug lords in Manhattan, Daniel Core (aka "Danny Green Eyes").

22.     Core was a ruthless killer whom police believed controlled the drug trade in the Lower East Side of Manhattan and in much of Spanish Harlem.  He employed scores of workers, operated numerous drug "spots," and earned millions of dollars in illicit profits.

23.     Defendant CODELLA was assigned to the Lower East Side and was hoping to "take down" Core.

24.     As he wrote in his book, "Alphaville," CODELLA would illegally search and beat up suspects, plant evidence on them, coerce false confessions from them, take money from them, and lie about it to judges, prosecutors, defense lawyers, and Internal Affairs investigators.  For example, CODELLA would force drug dealers and junkies to manufacture false robbery complaints when the Police Department wanted to increase robbery arrests.

25.     CODELLA wrote in his book:

> I'd rewritten the *Patrol Guide* in order to suit my own needs.  I'd
> lied to bosses, friends, and district attorneys, told IAB [Internal
> Affairs Bureau] to go fuck themselves, and taught people I worked
> with to do the same.  I'd committed my own crimes to ensure that
> arrests were made and bad guys went to jail.

26.     CODELLA admitted coercing a confession out of a suspected rapist by stomping on his head, kicking his ribs, choking him until he passed out, kneeing him in the mouth until "[b]lood surged through his teeth," and, winking to his partner, taking the suspect to the bathroom, putting a gun to his head, cocking the hammer, and saying, "Either your confession, or

your brains, will be all over that paper in five minutes."

27. CODELLA acknowledged being the subject of nearly two dozen Internal Affairs and other misconduct complaints, but claimed that every one was decided in his favor.

28. On two occasions, CODELLA illegally searched Plaintiff in the street, took money from him, and told him that if he complained about it CODELLA would plant drugs on him and arrest him for narcotics possession. Plaintiff never received any official notice of forfeiture proceedings and presumably CODELLA simply stole his money.

29. Defendant THEIS gained the cooperation of the two survivors of the FDR shooting, Rafael Garcia and Pedro Mejia, both drug dealers.

30. Garcia and Mejia identified Nicio Fonseca, Willie Perez, and Wilbur Hernandez – all close associates of Core's – as participants in the FDR murders.

31. On January 11, 1990, THEIS swore out a felony complaint charging Fonseca and Perez with the FDR murders.

32. The two men were arrested and judicial proceedings against them began.

33. On or about January 19, 1990, Defendant THEIS spoke with a witness who was a family member of Fonseca's.

34. This family member told THEIS that Johnny "Moose" Vargas had admitted to her that he was a participant in the FDR murders.

35. She said Vargas told her the four participants included himself, Wilbur Hernandez, Willie Perez, and either "Little Danny" or "Pretty Eddie."

36. THEIS knew that "Little Danny" was an associate of Core's known named Danny DeJesus.

7

37. THEIS credited the perpetrator's statement to the woman.

38. On the basis of the perpetrator's statement to the woman, THEIS caused the charges against Fonseca to be dismissed and for Fonseca to be released from custody.

39. On March 12, 1990, Anibal Vera, a drug addict and dealer, was arrested in a drug sweep in the Lower East Side and charged with misdemeanor possession of crack cocaine.

40. Vera was on probation for robbery.

41. Vera was deeply afraid of going to prison for violating his probation.

42. Vera told police that, in exchange for his release from custody, he could provide them with information about the FDR shootings.

43. Two detectives met with Vera, but concluded that he did not have any new or useful information.

44. The next day, still in custody, Vera was interviewed by defendant THEIS.

45. Vera told THEIS he knew about the murders, and he provided information that was readily available on the street.

46. However, THEIS arranged for Vera to be released so that he could function as a confidential informant.

47. Later in March, Fonseca, Garcia, and Mejia – all of whom had cooperated with THEIS in his investigation – were murdered.

48. The assigned ADA then interviewed two individuals who also were relatives of Fonseca.

49. The two relatives said they knew "Moose" and others involved in the FDR murders. They provided Finerty with the names of the four individuals who committed them.

8

Plaintiff was not one of the four.

50. Thereafter, THEIS met with Vera on numerous occasions to question him about his knowledge of the FDR murders and other crimes.

51. THEIS threatened that, unless Vera provided information THEIS could use about these crimes, he would be prosecuted for the FDR murders or other homicides or crimes, and/or would have his probation violated and be sent to prison.

52. Finally, in or about August, 1990, Vera named Plaintiff and another individual named Danny Colon as participants in the FDR shooting.

53. Vera claimed, in substance, that Plaintiff was present when Colon said they had both been involved in the shooting and Plaintiff did not deny participation.

54. It was the announced policy of the NYPD, and THEIS had been trained, to take notes and prepare reports, known as DD5s, of all relevant interviews with witnesses who claimed knowledge of serious crimes that were under investigation.

55. Nevertheless, THEIS kept no notes, and prepared no report, of any of his many interviews with Vera in which Vera either denied personal knowledge of who committed the FDR shootings, failed to name Plaintiff, or made other statements that were inconsistent with his eventual testimony.

56. THEIS arranged with the assigned ADA to enter into an agreement with Vera under which Vera's criminal charge of crack cocaine possession would be reduced to the non-criminal offense of disorderly conduct and he would avoid going to prison for his probation violation.

57. On or about August 12, 1990, defendant CODELLA, in connection with his duties

9

for the NYCHA and the State and Federal narcotics task force, arrested Plaintiff on federal narcotics charges. CODELLA told Plaintiff, in words or in substance, that he should cooperate with and become an informant or else he would soon also be arrested for a murder that CODELLA acknowledged Plaintiff was not responsible for.

58. CODELLA had learned from THEIS or others in the NYPD that Plaintiff was going to be charged with a murder they knew or believed he had not committed.

59. CODELLA had agreed with THEIS and others in the NYPD and NYCHA to use the threat of such prosecution as leverage to coerce Plaintiff to become an informant for them.

60. Plaintiff did not know what murder CODELLA was referring to and refused to become an informant. He remained in federal custody.

61. On or about October 12, 1990, Defendant THEIS took custody of Plaintiff and formally arrested him for the FDR murders.

62. During the arrest processing, THEIS told Plaintiff, in words or in substance, that THEIS knew who the real murderers were, that THEIS knew Plaintiff was not one of them, and that Plaintiff should save himself by cooperating with the police investigation of this and other murders and drug-related crimes.

63. THEIS showed Plaintiff photos of various individuals, including the victims of the FDR shooting, Wilbur Hernandez, and Danny Colon.

64. When Plaintiff refused to cooperate, THEIS brought him to court to be arraigned on the murder charges.

65. The grand jury that indicted Plaintiff for the FDR murders had no evidence that Plaintiff was involved in the crime except for the testimony of Vera.

66. The grand jury would not have indicted Plaintiff on nothing more than the word of this heroin addict and career criminal had THEIS and others not caused material evidence to be withheld from it, including, but not limited to, the following:

    a.      That the assigned homicide detective, THEIS, knew and believed that Wilbur Hernandez, Willie Perez, and Johnny "Moose" Vargas were all present in the van when the shooting occurred, that there were only four participants, and that both Danny Colon and Plaintiff could not have been the fourth participant;

    b.      That Nicio Fonseca had been identified by one or both of the two survivors of the incident as the fourth participant and their statements were sufficiently credited by THEIS and other law enforcement authorities that Fonseca was arrested;

    c.      That Fonseca had been released from custody, and the charges against him dropped, because THEIS, upon further investigation, concluded that the fourth participant in the murders was either "Little Danny" or "Pretty Eddie", neither of whom was Plaintiff;

    d.      That the only witness against Plaintiff, Anibal Vera, had made numerous statements to THEIS in which Vera failed to identify Plaintiff as one of the participants in the shooting;

    e.      That Vera had a motive to lie because his efforts to cooperate as a narcotics informant had been unsuccessful and THEIS had threatened him that, unless he provided useful information in the FDR shooting case, he would go to prison;

    f.      That THEIS and other detectives knew Vera was still using and selling drugs, yet did not arrest him for such activities; and

    g.      That THEIS and CODELLA had threatened Plaintiff with a *false* prosecution for the FDR murders if he did not agree to become a confidential informant.

**B.**      <u>Vera Nearly Implodes As A Witness And Is Secretly Saved by the ADA</u>

67. Following Plaintiff's arraignment, the trial of the case was delayed for nearly three years. During this period, the case nearly fell apart, in the following ways, because of Vera's

criminal behavior.

68. *First*, Vera was continually violating the conditions of his probation by using and selling drugs, changing his residence without notice or permission, failing to attend drug counseling programs, and failing to report when required to his probation officer.

69. The assigned ADA confirmed for the Probation Department, when it informed her that it was considering violating Vera for failure to comply with his conditions of probation, that he was a key witness for her Office, and he was not then violated.

70. *Second*, Vera, while housed at a mid-town hotel by the District Attorney's Office as a "protected" witness, was found in possession of a firearm, which subjected him to potential federal criminal prosecution as a "felon in possession" and which violated the terms of his probation.

71. Also found in his room was a large bag of white powder which most likely was heroin or cocaine.

72. Because of Vera's status as a cooperating witness, the police and the assigned ADA conducted no meaningful investigation of the incident, kept minimal records of it, did not notify federal authorities, Vera's probation officer, or the court supervising Vera's probation, and never disclosed the incident to Plaintiff or his attorney.

73. *Third*, Vera was arrested twice, once for possession of narcotics, then for a B-felony sale, and he was charged with violating his probation.

74. On the B felony, Vera faced a potential sentence of 12 ½ to 25 years in prison, consecutive to any sentence he received for violating his existing probation for robbery.

75. Vera was prosecuted on the two narcotics arrests by the Office of Special

Narcotics Prosecutor, an essentially independent office from the Manhattan District Attorney.

76. Nevertheless, the assigned ADA handling Plaintiff's homicide prosecution arranged, in place of the Special Narcotics ADA, to handle Vera's initial arraignment on his felony indictment in the State Supreme Court.

77. In an off-the-record conversation at the judge's bench, the assigned ADA told the judge that Vera was cooperating with her in a homicide prosecution.

78. During the same conversation at the bench, the assigned ADA offered Vera a plea bargain that would cover all of Vera's open cases in exchange for a guilty plea to a reduced charge and a sentence not to exceed 2 ½ to 5 years in prison. Vera did not immediately accept the offer.

79. Thereafter, on one or more occasions, the assigned ADA provided a status report to the assigned Special Narcotics prosecutor confirming that Vera was still cooperating with her prosecution and was an essential witness. As a result, the Special Narcotics prosecutor kept open the plea bargain offer even though Vera had rejected it and had stated he would contest the charges against him at a trial.

80. *Fourth*, Vera "jumped bail" as his scheduled trial on his narcotics sale case was about to begin.

81. Two months later, Defendant THEIS arrested him and brought him back to court.

82. The assigned ADA again told the Special Narcotics ADA that Vera continued to be an essential witness in her murder prosecution of Plaintiff.

83. As a result of this additional intervention by the assigned ADA on Vera's behalf, the Narcotics ADA made him an even better plea offer: he could have the same 2 ½ to 5 year

deal, except now it would also cover his potential prosecution for bail-jumping.

84. This time, Vera accepted the deal, pled guilty, and received the agreed-upon sentence.

85. *Fifth*, Vera threatened to refuse to testify unless the D.A.'s Office provided assistance in relocating his grandparents, who had raised him, to a more desirable public housing project.

86. The assigned ADA agreed to assist Vera's grandparents and thereafter the District Attorney's relocation office did assist in their relocation.

**C.      Core Is Recruited To Buttress The Prosecution's Crumbling Case**

87. In September 1990, Daniel Core was arrested for the murders of the two survivors of the FDR shooting, Pedro Mejia and Rafael Garcia. He faced 25 years to life in prison for each killing, with the possibility of consecutive sentencing.

88. In or about July, 1991, Core also was charged by federal authorities with operating a Continuing Criminal Enterprise, and faced up to life in prison on that charge as well.

89. Assigned to the joint state-federal narcotics task force, defendant CODELLA participated in the investigation of Core.

90. Core decided to cooperate with the federal and state authorities in order to obtain leniency for himself.

91. Aware that Plaintiff and Colon already were indicted for the FDR murders, Core conveniently claimed that each of them had confessed his involvement in the murders to him.

92. The "details" of the shooting that Core claimed Plaintiff and Colon had confessed to him were details that Core knew independently from various other sources,

14

including Wilbur Hernandez and the other actual participants.

93.     Core denied that he had approved, arranged, was responsible for, or had prior

knowledge of, the FDR shooting.

94.     However, Core acknowledged the following:

a.      Others involved in the shooting, including "Moose", Willie Perez, and Wilbur Hernandez, had been involved with him in other murders and violent incidents and in large-scale drug dealing;

b.      Shortly before the FDR murders, he and his close associate, Nicio Fonseca, had been arrested together in the Bronx and indicted for gun possession;

c.      Core previously had been involved in a shootout directed at Orlando Martin, the intended victim of the FDR shooting;

d.      Core's close associate in murders and drug dealing, Wilbur Hernandez, wanted to kill Orlando Martin because he believed Martin intended to kill him;

e.      Within an hour of the FDR shooting, Core was notified of it in Florida and arranged to immediately return to New York;

f.      Upon his return he met right away with Wilbur Hernandez and was informed of what had occurred;

g.      Hernandez told him (consistent with Johnny "Moose" Vargas's statement to others) that four people committed the murders, including Hernandez, Perez, Vargas, and one other person;

h.      The weapons used in the FDR shooting belonged to Core;

i.      Hernandez confessed to Core having murdered Nicio Fonseca in the belief that he was cooperating with the authorities; and

j.      Core himself accepted a $50,000 contract to arrange for the assassination of Mejia and Garcia, the two survivors of the FDR shooting, in the belief that they were cooperating with the authorities, too, and then arranged to have them killed.

15

95. Core further acknowledged having personally committed or ordered a total of 14 murders, having controlled 200-300 "workers" in his heroin distribution organization, and having grossed up to $140,000 per day from it.

96. Under his cooperation agreement with the State and Federal authorities, Core agreed to plead guilty to State and Federal charges, in exchange for a promise that he would not be prosecuted for the additional murders and other criminal activities he had admitted, that the authorities would recommend a sentencing reduction due to his cooperation, and that he would receive concurrent time, to be served in a federal institution.

97. However, the agreement included a provision that, if Core provided any untruthful testimony or otherwise violated the agreement, the agreement would be terminated and he would be subject to prosecution for all the crimes he had admitted committing, including the dozen or so uncharged homicides.

98. Defendant CODELLA knew, from his own sources and investigation, that Core's denial of any prior involvement in the FDR shootings was false.

99. CODELLA wrote in his book that the FDR murders were with "[Danny Green] Eyes's approval."[2]

100. Core's denial of such a significant fact blatantly violated his cooperation agreement and subjected him to prosecution for all the murders and other crimes he had admitted committing.

101. Defendant CODELLA also knew, according to CODELLA's book, that Core,

[2]In his book, CODELLA changed certain names. He changed Core's name from "Danny Green Eyes" to "Davey Blue Eyes."

before his homicide arrest in 1990, had put out a "contract" on CODELLA's life.

102. Furthermore, CODELLA knew and believed, according to CODELLA's book, that Core had "killed dozens of people," not "just" the 14 or so he admitted to prosecutors as part of his cooperation.

**D.    Plaintiff's Imprisonment In The Bronx And Vicious Assault**

103. In or about January 1992, Plaintiff was transferred from federal custody to New York City in anticipation of his State homicide trial.

104. In or about April 1992, Plaintiff was transferred to Rikers Island in the Bronx, where he remained for approximately 20 months.

105. In mid-June, 1993, while jury selection was underway for Plaintiff's homicide trial, another inmate wielding a razor viciously assaulted Plaintiff at Rikers Island in the Bronx.

106. Plaintiff was slashed across his face and neck and behind his ear, and received more than 130 stitches to close the wound, leaving a thick, lengthy, permanent scar across his forehead, behind his ear, and on his scalp.

107. Due to the pain that Plaintiff was in and the horrible appearance of his wound, the court declared a mistrial. The trial resumed on June 24, 1993, with the selection of a new jury.

**E.    The Trial Proceedings**

108. The only two trial witnesses to identify Plaintiff as a participant in the charged murders were Vera and Core.

109. Vera denied any conceivable motive, interest or bias that might cause him to lie.

110. He flatly denied that, apart from the one-time benefit he had received in 1990 in connection with his probation violation, he had received, or would receive, any promise, benefit,

or consideration.

111. Vera testified he had received "no breaks, no nothing."

112. Vera specifically denied that the assigned ADA had "anything to do" with the 2 ½ to 5 year sentence he had received pursuant to his plea bargain with the Office of Special Narcotics Prosecutor.

113. Vera testified that the assigned ADA did not even know of his arrests in the cases that were resolved by that plea bargain..

114. The assigned ADA, in her summation, then vouched, as an "unsworn" witness, for the truthfulness of Vera's testimony.

115. She stated to the jury that "*we* had nothing to do with the plea he ultimately took with a two and a half to five year sentence" (emphasis added).

116. Vera, she said, is "not going to benefit any more from this, telling you what he knows."

117. She argued that Vera was credible because he had been a "very good friend" of Danny Colon's and had no reason to implicate Colon or Plaintiff "if it's not true."

118. She further vouched for Vera's credibility by arguing that he was motivated to testify because one of the two deceased victims, Frankie Morales, had not been in the drug trade and had not been an intended victim and "Mr. Vera told you he felt bad about that, *he really did*" (emphasis added).

119. Vera's testimony denying any conceivable motive to lie and that the assigned ADA had "anything to do" with his favorable plea bargain, and the ADA's representations to the jury vouching for this testimony, were false. As alleged above in ¶¶ 67-86, the assigned ADA:

18

A. Personally offered Vera in court the favorable plea bargain he ultimately accepted;

B. Repeatedly interceded with the court, the Special Narcotics Prosecutor, and the Probation Department on his behalf;

C. Did not investigate and took no action against Vera, and violated her obligation to report to the probation department and federal authorities, Vera's possession as a convicted felon of a gun in his hotel room; and

D. Agreed to Vera's demand that her Office assist in arranging the relocation of Vera's grandparents, without which he was threatening to refuse to testify, and in fact did assist in their relocation.

120. The assigned ADA did not correct Vera's false testimony or the ADA's own false arguments, nor did she disclose any of the information that would have revealed the falsity of the testimony and arguments.

121. While the ADA did disclose that Vera had not initially named Plaintiff (or Danny Colon) as participants in the FDR shooting, she did not disclose any notes or reports containing Vera's specific, prior inconsistent statements or claims of a lack of recollection, or the specific statements themselves, which prevented the defense from effectively impeaching his credibility.

122. As for the second witness, Core, the ADA put in evidence the terms of Core's formal cooperation agreement, including a provision that, if any of his testimony was untruthful, the agreement would be "null and void" and he would be subject to prosecution and sentencing for all the horrific crimes he had admitted.

123. The ADA used this provision to vouch for the truthfulness of his testimony since the agreement had not been voided.

124.    Meanwhile, she argued that there was "no proof" that Core had been involved in the FDR murders and that his denial of such responsibility was truthful. She denied even that Core had ever been a suspect in the FDR murders.

125.    However, neither the ADA, nor any of the other defendants, disclosed to Plaintiff, the court, or the jury that Core's testimony was not truthful in at least the following respects:

A.    Contrary to Core's denial, he had approved or directed the FDR murders, a fact that undercut his entire story about how he had learned about the incident and Plaintiff's alleged involvement;

B.    He was responsible for "dozens of murders, not "just" 12 to 14;

C.    He had not disclosed all his other crimes to the jury, as he was known to have ordered the murder of defendant CODELLA.

126.    In a further improper argument amounting to vouching for the People's case and "testifying" as an unsworn "witness," the ADA told the jury that "we guaranteed, we made sure" that Vera and Core had been kept separate and had no opportunity to conform their testimony to the other, and that was "incredible proof of the truth of what they're saying."

127.    Finally, the ADA "testified" as an unsworn "witness" that one of the alternative suspects to Plaintiff and Colon, Necio Fonseca, had not been indicted because "he didn't do it, and the law enforcement officials realized he didn't do it so he wasn't indicted."

128.    At the same time, she did not disclose her knowledge, as set forth above in ¶¶ 48-49, that two witnesses had provided her with the identities of the actual shooters and Plaintiff was not one of them. This prevented the defense from investigating the information and presenting evidence to the jury in support of its position that others, besides Plaintiff and Danny

Colon, participated in the incident.

129. After five days of deliberations, Plaintiff and Colon were convicted of the two murders, and each received 50 years to life in prison.

**F.     Post-Trial Proceedings And The Overturning of Plaintiff's Conviction**

130. Plaintiff's and Danny Colon's convictions were affirmed on appeal. *People v. Colon and Ortiz*, 238 A.d.2d 213 (1st Dept. 1997).

131. On November 20, 2003, Danny Colon, through a new attorney, moved to vacate his conviction on the basis of new information, recently obtained from Anibal Vera, that Vera had received benefits in connection with his testimony that were not disclosed at trial. Vera was located and interviewed in the Bronx. Vera provided an affidavit recanting his testimony implicating Plaintiff and Colon in the murders, and recounting the benefits he had received. By this time, Plaintiff and Danny Colon already had spent ten years in prison on their conviction.

131. When Plaintiff learned of this motion, he asked for and received permission by the court to join in it.

132. An evidentiary hearing was held, at which the assigned ADA and THEIS, both of whom were now retired from their City employment, testified.

133. The District Attorney's Office vigorously opposed the motion for a new trial, denying that the ADA had done anything wrong.

134. Although the court found that the ADA should have turned over certain information, it refused to overturn the convictions.

135. Plaintiff and Colon requested permission from a justice of the Appellate Division to appeal. The People vigorously opposed such permission. Had permission been denied, that

would have been the end of the legal process and Plaintiff would have spent the rest of his life in prison. However, permission was granted.

136. The District Attorney's office, denying that the assigned ADA had done anything wrong, opposed Plaintiff's appeal, and on October 28, 2008, the Appellate Division denied it.

137. Now Plaintiff and Colon sought permission to appeal from a judge of the New York Court of Appeals. Once more, the D.A.'s Office denied any wrongdoing and opposed further appeal, seeking to keep Plaintiff in prison for the rest of his life. But, once again, permission was granted.

138. In their brief, the D.A.'s Office still again denied that the assigned ADA had done anything wrong in failing to disclose information and presenting evidence and argument that misled the defense and the jury, and argued that Plaintiff's conviction should be undisturbed.

139. However, on November 19, 2009, the Court of Appeals unanimously rejected the D.A.'s position, reversed the Appellate Division's decision, vacated Plaintiff's and Colon's convictions, and granted them a new trial.

140. Quoting its earlier decision, *People v. Steadman*, 82 N.Y.2d 1, 7 (1993), the Court began by noting prosecutors' obligation to "'deal fairly with the accused and be candid with the courts.'" It went on: "This duty requires prosecutors not only to disclose exculpatory or impeaching evidence but also to correct the knowingly false or mistaken material testimony of a prosecution witness."

141. The Court then concluded that the prosecutor had personally elicited untrue testimony from Vera – that he had received no additional benefits and that she had no involvement with his 1992 case – and had "failed to correct Vera's misleading testimony and, in

addition, compounded these errors by repeating and emphasizing the misinformation during summation."

142. The Court stressed: "[I]t is important that witnesses provide truthful testimony when questioned about the receipt of such benefits, and the People must be vigilant to avoid misleading the court or jury. Rather than correct the inaccurate testimony, the prosecutor here exacerbated the problem during her closing comments."

143. Agreeing with plaintiff's *Brady* arguments, the Court also held that the prosecutor should have disclosed (a) her notes of the two witness statements naming other suspects, and (b) the discovery of the gun in Vera's hotel room.

144. With the case now before the State Supreme Court in Manhattan for a new trial, the D.A.'s Office, claiming an intention to retry Plaintiff, successfully opposed Plaintiff's release on bail.

145. However, on March 29, 2010, the court, noting the weakness of the People's case, set $25,000 bail.

146. Shortly thereafter, his family posted the bail, and Plaintiff was released.

147. Thereafter, prosecutors acknowledged that both Vera and Core had denied any memory of Plaintiff's alleged confession of involvement in the FDR shooting.

148. On June 29, 2011, the Manhattan D.A.'s Office acknowledged it lacked evidence with which to re-try Plaintiff.

149. The Office agreed to the dismissal of all charges against Plaintiff (and Danny Colon).

150. It had taken the Manhattan District Attorney's Office more than 19 months to

dismiss an indictment for which it no longer had any supporting evidence.

**K.** **Plaintiff's Damages and Injuries**

151. Plaintiff's injuries and damages include, but are not limited to:

    (a)    His loss of liberty from the date of his arrest for the FDR murders through his release from custody;

    (b)    Disfiguring physical injuries, substantial physical pain, and substantial mental and emotional suffering, as the result of prison assaults by other inmates;

    (c)    Past and future severe mental and emotional distress due to his wrongful prosecution and conviction on murder charges and his wrongful imprisonment;

    (d)    The loss of the services, society, companionship, and consortium of his family members and friends; and

    (e)    The loss of employment income, and diminution of future earning ability, due to his prosecution and imprisonment, in an amount to be determined by an economic expert.

## FIRST CAUSE OF ACTION

### (Malicious Prosecution Under State Law; All Defendants)

152. Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1 through 151 of this Complaint.

153. By virtue of the foregoing, the Individual Defendants, acting in concert with each other and with additional persons for whose acts they are liable, initiated, continued, and/or

caused the initiation or continuation of, criminal proceedings against Plaintiff.

154. The criminal proceedings terminated in Plaintiff's favor.

155. There was no probable cause for the commencement or the continuation of the criminal proceedings.

156. The Defendants acted with actual malice.

157. Defendants City of New York and NYCHA are liable under the principle of *respondeat superior*.

## SECOND CAUSE OF ACTION

### (Intentional Infliction of Emotional Distress Under State Law; All Defendants)

158. Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1 through 157 of this Complaint.

159. Defendants engaged in a continuous pattern of extreme and outrageous conduct directed at Plaintiff.

160. Defendants engaged in that pattern of conduct with an intention to cause, or in reckless disregard of the substantial probability that it would cause, Plaintiff severe emotional distress.

161. Specifically, defendants, individually, in concert with, conspiring with, and/or aiding and abetting one another and other persons for whose acts they are liable, coerced one or more witnesses into making false statements to be used against Plaintiff, initiated or caused the initiation and continuation of false and unfounded criminal charges against Plaintiff while lacking probable cause to do so, and suppressed *Brady*, *Giglio*, and *Rosario* material they knew they were required to disclose to the District Attorney for disclosure to Plaintiff.

162. Plaintiff suffered severe emotional distress as a result of, and that was proximately caused by, the Defendants' aforementioned actions.

163. By virtue of the foregoing, Plaintiff suffered the damages identified in ¶ 151.

164. Defendants City of New York and NYCHA are liable under the principle of *respondeat superior.*

**THIRD CAUSE OF ACTION**

**(42 U.S.C. §1983; Denial Of Due Process And A Fair Trial
Under the Fifth, Sixth and Fourteenth Amendments;
Malicious Prosecution and Deprivation of Liberty
Under the Fourth and Fourteenth Amendments;
All Individual Defendants)**

165. Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1 through 164 as if fully set forth herein.

166. By virtue of the foregoing, the Individual Defendants, with actual malice and in bad faith, initiated and continued, caused the initiation and continuation of, conspired to cause the initiation and continuation of, and/or violated their duty to intervene to prevent the initiation or continuation of, criminal proceedings against Plaintiff for which they knew, or should have known, there was no probable cause, which proceedings they knew were based, in whole or in part, on false, manufactured, or unreliable "evidence," and thereby caused Plaintiff to be deprived of his liberty.

167. Such proceedings ultimately were terminated in Plaintiff's favor.

168. Additionally, the Individual Defendants knew, but withheld from the Manhattan District Attorney's Office, either permanently or for a substantial period of time, and therefore from the court and the defense, exculpatory or impeachment evidence, including but not limited to the

evidence specified above in ¶¶ 21, 23-28, 51, 57-60, 62, 98-102, which they knew was favorable to Plaintiff and which they knew or should have known the law required them to timely disclose.

169. The aforesaid conduct, which the Individual Defendants committed, or conspired to commit, in aid of each other and/or others named and unnamed, or which they wilfully aided and abetted, operated to deprive Plaintiff of his rights under the Constitution and the Laws of the United States:

(a) Not to be arrested, indicted, prosecuted, detained, convicted, or imprisoned based upon false, fabricated, manufactured, misleading, or inherently unreliable "evidence," including the statements and testimony of witnesses who have been improperly influenced, coerced, or manipulated to provide such statements and testimony, in violation of the Due Process and Fair Trial Clauses of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution;

(b) Not to be deprived of his liberty absent probable cause to believe he has committed a crime, in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution; and

(c) To timely disclosure of all material evidence favorable to the defense pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny, and the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

170. The foregoing violations of Plaintiff's federal constitutional rights by the Defendants and their co-conspirators and accomplices, known and unknown, directly, substantially, proximately, and foreseeably caused the initiation and continuation of Plaintiff's criminal prosecution, his loss of liberty and detention without bail, his wrongful conviction, his subsequent imprisonment, and his other injuries and damages.

171. The foregoing violations of Plaintiff's rights amounted to Constitutional torts and were affected by actions taken under color of State law, and within the scope of the Individual

Defendants' employment and authority.

172. The Individual Defendants committed the foregoing violations of Plaintiff's rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to Plaintiff's constitutional rights or to the effect of such misconduct upon Plaintiff's constitutional rights.

173. By reason of the foregoing, the Individual Defendants are liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for compensatory and for punitive damages.

## FOURTH CAUSE OF ACTION

### (*Monell*/42 U.S.C. § 1983: Claim Against Defendant City of New York For The Actions Of The NYPD)

174. Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1 through 173.

175. The foregoing violations of Plaintiff's federal constitutional rights and injuries were further directly, foreseeably, proximately, and substantially caused by conduct, chargeable to Defendant City, amounting to deliberate indifference to the constitutional rights of persons, including Plaintiff, who are investigated, arrested, or prosecuted for alleged criminal activities.

176. Prior to Plaintiff's arrest, policymaking officials at the NYPD, with deliberate indifference to the constitutional rights of individuals suspected or accused of criminal activity, to the risk of arresting, prosecuting and convicting innocent people, and to the right of all criminal suspects and defendants to due process and a fair trial, implemented plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning:

> (a) The use of excessive promises of rewards and unduly coercive interrogation techniques with vulnerable potential witnesses, including drug users and addicts, drug dealers, and/or individuals fearing prosecution and imprisonment for their own criminal behavior;

28

(b)     The determination of probable cause to make an arrest and the avoidance of arrests and prosecutions based upon falsely manufactured or unreliable "evidence"; and

(c)     The continuing duty of police investigators to preserve and to make timely disclosure to the District Attorney, during criminal investigations and prosecutions, of all material evidence or information (*"Brady* material") favorable to a person suspected, accused or convicted of criminal conduct, including, but not limited to, evidence of innocence, evidence that an identifying or prosecution witness is unreliable or lacks general credibility, evidence that a prosecution witness has made inconsistent statements about material facts, and evidence that a prosecution witnesses has a motive, bias or interest affecting his credibility or has been pressured or coerced, so that the District Attorney could comply with his constitutional obligation to disclose such information to the defense under *Brady*.

177.     The aforesaid deliberate or *de facto* policies, procedures, regulations, practices and/or customs (including the failure to properly instruct, train, supervise and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the Defendant City of New York, including but not limited to, the New York City Police Commissioner, who knew (or should have known):

a)     to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

b)     that such issues either present police employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of police employees mishandling such situations as well as the incentives that police employees have to make the wrong choice; and

c)     that the wrong choice by such employees concerning such issues will frequently cause the deprivation of the constitutional rights of criminal suspects or defendants and cause them constitutional injury.

178.     The aforementioned policymaking officials had notice of the existence of such

constitutional violations and of the need for meaningful training, supervision and discipline to

prevent them, and their policy of deliberate indifference to such constitutional violations was

revealed, by numerous circumstances, including but not limited to the following:

a) credible allegations, many substantiated by judicial decisions finding, that NYPD officers had wrongfully withheld material evidence or knowingly given false or misleading testimony, none of which resulted in discipline for the officers involved (*see* Exh. A appended hereto and incorporated herein by reference, listing some of those decisions);

b) civil lawsuits, some of which resulted in substantial civil settlements, credibly alleging that police had falsified, exaggerated, or withheld material evidence, or conducted searches or arrests without probable cause, none of which resulted in discipline for the officers involved (*see* Exh. B appended hereto and incorporated herein by reference, listing some of those lawsuits);

c) the Mollen Commission investigation, hearings, and report in or about 1992-1994 finding that misconduct by police in manufacturing false evidence and making arrests based upon coercion, undue promises, outright lies, and other dishonest tactics was pervasive in the New York City Police Department and that the Police Department had been indifferent to such practices;

d) numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Division, discussing the difficult issues that regularly arise under *Brady* as well as the probable cause requirement of the Fourth Amendment;

e) judicial decisions directly criticizing the NYPD for failing to train and supervise officers in their *Brady* obligations and for failing to adopt adequate *Brady* disclosure policies, *see Carter v. Harrison*, 612 F. Supp. 749 (E.D.N.Y. 1985) (McLaughlin, D.J., adopting the Report and Recommendation of then Magistrate Shira A. Scheindlin), and putting the NYPD on notice that the City could be held liable for its failure to adequately train police officers and investigators regarding their obligations to provide truthful testimony and to disclose evidence that favors criminal defendants under under *Brady*, *see Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992), and *Carter v. Harrison, supra*;

f) formal reports of the N.Y.C. Comptroller's Office and the Bar Association of the City of New York criticizing the NYPD and the N.Y.C. Law Department for failing to follow up substantial civil settlements for police

30

misconduct with disciplinary or other remedial action; and

g)    the inherent obviousness of the need to train, supervise and discipline police officers in such obligations to counteract the pressure on officers and the powerful incentives they have to close cases and to obtain arrests and convictions.

179.    Under the principles of municipal liability for federal civil rights violations, the City's Police Commissioner (or his authorized delegates), has final responsibility for training, instructing, supervising, and disciplining police personnel with respect to the investigation and prosecution of criminal matters, including constitutional requirements governing the interrogation of witnesses, the initiation of criminal prosecutions, and the disclosure of *Brady* material.

180.    The Police Commissioner, personally and/or through his authorized delegates, at all relevant times had final authority, and constitutes a City policymaker for whom the City is liable, with respect to compliance by NYPD employees with the above-mentioned constitutional requirements.

181.    During all times material to this Complaint, the Police Commissioner owed a duty to the public at large and to Plaintiff, which he knowingly and intentionally breached, or to which he was deliberately indifferent, to implement policies, procedures, customs, practices, training and discipline sufficient to prevent or deter conduct by his subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

182.    The aforesaid policies, procedures, regulations, practices and/or customs of Defendant City and the NYPD were collectively and individually a substantial factor in bringing about the aforesaid violations by the Individual Police Defendants of Plaintiff's rights under the Constitution and laws of the United States.

183.    By virtue of the foregoing, Defendant City of New York is liable for having

31

substantially caused the foregoing violations of Plaintiff's constitutional rights and his constitutional injuries.

## FIFTH CAUSE OF ACTION

### (*Monell*/42 U.S.C. § 1983: Claim Against The NYCHA
### For Actions Of The Housing Police)

184. Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1 through 183 of the Complaint.

185. The foregoing violations of Plaintiff's federal constitutional rights and injuries were further directly, foreseeably, proximately, and substantially caused by conduct, chargeable to Defendant NYCHA, amounting to deliberate indifference to the constitutional rights of persons, including Plaintiff, who were investigated, arrested, or prosecuted for alleged criminal activities.

186. Prior to Plaintiff's arrest, policymaking officials at the NYCHA, with deliberate indifference to the constitutional rights of individuals suspected or accused of criminal activity, to the risk of arresting, prosecuting and convicting innocent people, and to the right of all criminal suspects and defendants to due process and a fair trial, implemented plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning:

(a) The use of excessive promises of rewards and unduly coercive interrogation techniques with vulnerable potential witnesses, including drug users and addicts, drug dealers, and/or individuals fearing prosecution and imprisonment for their own criminal behavior;

(b) The determination of probable cause to make an arrest and the avoidance of arrests and prosecutions based upon falsely manufactured or unreliable "evidence"; and

(c) The continuing duty of police investigators to preserve and to make timely disclosure to the District Attorney, during criminal investigations and prosecutions, of all material evidence or information (*"Brady* material") favorable to a person suspected, accused or convicted of criminal conduct,

including, but not limited to, evidence of innocence, evidence that an identifying or prosecution witness is unreliable or lacks general credibility, evidence that a prosecution witness has made inconsistent statements about material facts, and evidence that a prosecution witnesses has a motive, bias or interest affecting his credibility or has been pressured or coerced, so that the District Attorney could comply with his constitutional obligation to disclose such information to the defense under *Brady*.

187. The aforesaid deliberate or *de facto* policies, procedures, regulations, practices and/or customs (including the failure to properly instruct, train, supervise and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the Defendant NYCHA, including but not limited to, the NYCHA Police Commissioner, who knew (or should have known):

a) to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

b) that such issues either present police employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of police employees mishandling such situations as well as the incentives that police employees have to make the wrong choice; and

c) that the wrong choice by such employees concerning such issues will frequently cause the deprivation of the constitutional rights of criminal suspects or defendants and cause them constitutional injury.

188. The aforementioned policymaking officials had notice of the existence of such constitutional violations and of the need for meaningful training, supervision and discipline to prevent them, and their policy of deliberate indifference to such constitutional violations was revealed, by numerous circumstances, including but not limited to the following:

a) credible allegations, many substantiated by judicial decisions finding, that NYPD and NYCHA officers had wrongfully withheld material evidence or knowingly given false or misleading testimony, none of which resulted in discipline for the officers involved (*see* Exh. A appended hereto and incorporated herein by reference, listing some of those decisions);

33

b) civil lawsuits, some of which resulted in substantial civil settlements, credibly alleging that police had falsified, exaggerated, or withheld material evidence, or conducted searches or arrests without probable cause, none of which resulted in discipline for the officers involved (*see* Exh. B appended hereto and incorporated herein by reference, listing some of those lawsuits);

c) the Mollen Commission investigation, hearings, and report in or about 1992-1994 finding that misconduct by police in manufacturing false evidence and making arrests based upon coercion, undue promises, outright lies, and other dishonest tactics was pervasive in New York City and that local police departments had been indifferent to such practices;

d) numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Division, discussing the difficult issues that regularly arise under *Brady* as well as the probable cause requirement of the Fourth Amendment;

e) judicial decisions directly criticizing police in New York City for failing to train and supervise officers in their *Brady* obligations and for failing to adopt adequate *Brady* disclosure policies, *see Carter v. Harrison*, 612 F. Supp. 749 (E.D.N.Y. 1985) (McLaughlin, D.J., adopting the Report and Recommendation of then Magistrate Shira A. Scheindlin), and putting New York City police departments on notice that they could be held liable for their failure to adequately train police officers and investigators regarding their obligations to provide truthful testimony and to disclose evidence that favors criminal defendants under under *Brady*, *see Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992), and *Carter v. Harrison, supra*;

f) formal reports of the N.Y.C. Comptroller's Office and the Bar Association of the City of New York criticizing the NYPD and the N.Y.C. Law Department for failing to follow up substantial civil settlements for police misconduct with disciplinary or other remedial action; and

g) the inherent obviousness of the need to train, supervise and discipline police officers in such obligations to counteract the pressure on officers and the powerful incentives they have to close cases and to obtain arrests and convictions.

189. In addition, NYCHA policymakers showed their approval, willingness to tolerate, ratification of, and/or deliberate indifference to the kinds of constitutional violations referred to in ¶¶ 186-189 by failing to adequately investigate the dozens of misconduct complaints that had been

made against defendant CODELLA and his colleagues in the Housing police, failing to discipline CODELLA and his colleagues for any such misconduct, and utilizing CODELLA to train or supervise other NYCHA police officers while continually promoting him, despite their awareness of his illegal practices and the dozens of misconduct complaints that had been made against him.

190.    Under the principles of municipal liability for federal civil rights violations, the NYCHA's Police Commissioner (or his authorized delegates), had final responsibility for training, instructing, supervising, and disciplining police personnel with respect to the investigation and prosecution of criminal matters, including constitutional requirements governing the interrogation of witnesses, the initiation of criminal prosecutions, and the disclosure of *Brady* material.

191.    The Police Commissioner, personally and/or through his authorized delegates, at all relevant times had final authority, and constituted a policymaker for whom the NYCHA is liable, with respect to compliance by NYCHA employees with the above-mentioned constitutional requirements.

192.    During all times material to this Complaint, the NYCHA Police Commissioner owed a duty to the public at large and to Plaintiff, which he knowingly and intentionally breached, or to which he was deliberately indifferent, to implement policies, procedures, customs, practices, training and discipline sufficient to prevent or deter conduct by his subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

193.    The aforesaid policies, procedures, regulations, practices and/or customs of NYCHA were collectively and individually a substantial factor in bringing about the aforesaid violations by the Individual Police Defendants of Plaintiff's rights under the Constitution and laws of the United States.

35

194. By virtue of the foregoing, Defendant NYCHA is liable for having substantially caused the foregoing violations of Plaintiff's constitutional rights and his constitutional injuries.

## SIXTH CAUSE OF ACTION

### (*Monell*/42 U.S.C. § 1983 Claim Against Defendant City Of New York For Actions Of The New York County District Attorney's Office)

195. Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1 through 151 as if fully set forth herein.

196. Prior to, at the time of, and subsequent to Plaintiff's criminal prosecution, including during the period that the New York County District Attorney's Office was opposing Plaintiff's efforts to overturn his conviction and causing the continuation of his wrongful imprisonment, the New York County District Attorney, as the manager and chief administrator of the New York County District Attorney's Office, a New York City agency, maintained a policy, custom or practice of deliberate indifference to violations by his employees of the constitutional right to due process and a fair trial guaranteed to all criminal suspects and defendants under the Constitution and laws of the United States and the State of New York.

197. Such violations included the withholding of exculpatory and impeachment evidence favorable to the defense and required to be disclosed under discovery statutes and court decisions applying *Brady v. Maryland*, 373 U.S. 83 (1963), the knowing or reckless use of false or misleading evidence and argument concerning the credibility and motives to lie of cooperating witnesses, and the failure to correct such false or misleading evidence and argument.

198. More specifically, prosecutors in New York County (and NYPD detectives working with them on criminal investigations and prosecutions) were permitted and in fact instructed to

36

refrain from making any record of false or inconsistent out-of-court statements of prospective prosecution witnesses, or information bearing upon their potential motives to lie, in order to avoid creating "*Rosario* material" that would have to be disclosed to the defense under State law, even though this policy also predictably resulted in prosecutors ultimately not disclosing the same information as *Brady* material.

199. Prosecutors were permitted to withhold from criminal defendants their knowledge of other impeachment material, including, but not limited to, informal promises made to, and benefits received by, cooperating witnesses, and such witnesses' potential motives, biases and interests, which provided them reasons to give false, misleading, or exaggerated testimony.

200. Prosecutors were permitted to present false or misleading testimony and argument denying their witnesses' motives to lie, to fail to correct such false or misleading testimony and argument, and to improperly vouch for the credibility of such witnesses through the prosecutors' own arguments and unsworn "testimony" during their summations.

201. Prosecutors were permitted to maintain the "deniability" of impeachment information that they were required to disclose by deliberately avoiding acquiring direct or actual knowledge of it, and then presenting false or misleading testimony and argument that was contradicted by the undisclosed information. In the unlikely event that the defense was able to uncover and expose the information, the prosecutors would then argue that they were not guilty of personal misconduct because they lacked actual knowledge of the information, and the Office would not discipline them.

202. Prosecutors, in violation of their *Brady* disclosure obligations, were permitted to refrain from disclosing statements of uncalled witnesses which tended to favor the defense, including statements suggesting the defendant's innocence.

203. Finally, prosecutors were permitted or encouraged to deny or to defend the aforementioned types of misconduct in order to defeat or delay defendants's efforts to expose it and to overturn their wrongful convictions. Policymaking officials at the D.A.'s Office would almost always defend such behavior when it was challenged, including on direct appeal and on collateral attack, thereby communicating to all employees of the Office that such conduct would be tolerated or was even approved by the District Attorney and was consistent with the policies of the Office.

204. Pursuant to the aforementioned policies, customs, and/or practices of the New York County District Attorney's Office, the assigned ADA in Plaintiff's case consciously avoided gaining actual knowledge of information that would have impeached or contradicted the testimony of her witnesses at trial and which she was obligated to disclose under *Brady*, *Rosario*, and other rules and requirements, deliberately, recklessly, or negligently failed to disclose information she did know about that she was required under *Brady* to disclose, knowingly or recklessly presented testimony and her own arguments at trial that she knew or should have known were false or misleading, knowingly failed to correct such false testimony and arguments, and improperly vouched, including as an unsworn "witness," for the credibility of witnesses she knew had given false or misleading testimony.

205. Furthermore, pursuant to the aforementioned policies, customs, and/or practices of the New York County District Attorney's Office, when the assigned ADA's misconduct was revealed, the District Attorney's Office defended her behavior and argued that it was consistent with the Office's due process and fair trial obligations. The Office denied at every level – the State Supreme Court, the Appellate Division, and the Court of Appeals – that any misconduct had occurred at all.

38

206. But this is not the only proof that the assigned ADA's misconduct was consistent with, and resulted from, the unlawful policies, customs or practices of the Office. There were numerous other instances of similar misconduct, before Plaintiff's trial and during the period that the Office fought to save his wrongful conviction. In virtually all instances, the Office defended the misconduct when it was exposed, thereby revealing that the conduct was consistent with the policies of the Office and caused by them.

207. In *People v. Wallert*, 98 A.D.2d 47 (1st Dept. 1983), the Appellate Division found the prosecutor guilty of a "clear *Brady* violation," and of denying the defendant "a fair trial in violation of due process," based upon the prosecutor's argument in summation that the complainant in a sex crime case had no motive to lie when the prosecutor knew, but had concealed, that the complainant had consulted with a civil attorney and was waiting for the outcome of the trial before suing for monetary damages. The court reversed the conviction.

208. In *People v. Novoa*, 70 N.Y.2d 490 (1987), the Court of Appeals unanimously reversed the defendant's New York County murder conviction because "the prosecutor here breached a duty to disclose ... promises, to correct the witness's testimony that she was promised nothing, and to refrain from misstatements in summation." The prosecutor had elicited the witness's flat denial that "anyone had promised anything with respect to your pending case," and had then argued that she was a "forthright woman" who had no reason to lie because "she wasn't promised anything, ladies and gentlemen." In fact, the witness's Special Narcotics prosecutor had promised to consider the totality of her cooperation, including in the homicide case.

209. The *Novoa* Court emphatically rejected the District Attorney's position that the prosecutor did not mislead the jury because any promise of consideration had been made to the

witness by a different prosecutor in the Office of Special Narcotics and any such promise was merely "contingent and insignificant." The "separateness of offices" could not excuse the prosecutor's apparent "disinclination" to find out the truth, the Court reasoned. The prosecutor, it concluded, was responsible for her "failure to reveal the promise in the first instance, her failure to correct [the witness's] misstatement that she had been promised nothing with respect to her pending case, and her own affirmative mischaracterization in the summation [which] constituted both a denial of defendants' rights and a breach of her own obligations as an officer of the court."

210. In *People v. Conlan*, 146 A.D.2d 319 (1st Dept. 1989), the Appellate Division reversed another New York County murder conviction because of the prosecutor's "particularly disingenuous" denials that *she* had made any promise of consideration to a crucial prosecution witness, when the witness expected assistance with his own case based upon assurances of *another* assistant district attorney. The prosecutor "was certainly not warranted in disclaiming a deal simply because she had not personally made it," the court reasoned, continuing:

> Not only did she neglect to correct [the witness's] misleading statements relating to the existence of any promises, but she reaffirmed those statements by means of her own rebuttal, as well as by her ... summation .... However, the law is established that the failure of the prosecutor to correct a witness' erroneous impression that he had no reason to expect lenient treatment "constitutes 'error so fundamental, so substantial,' that a verdict of guilt will not be permitted to stand.

211. In still another case of wilful blindness and misleading of the defense and the jury, *People v. Grice*, 188 A.D.2d 397 (1st Dept. 1992), the trial court vacated the defendant's conviction because the prosecutor "did not ascertain and disclose the full details of a cooperation agreement

entered into by a material witness" in which his cooperation in Manhattan would likely benefit him in his own case in the Bronx. The People, denying any fault and somehow blaming the defense, appealed, but the Appellate Division affirmed the lower court's ruling. The court reasoned that it had been "incumbent upon the prosecutor herein to investigate and disclose [the] substantially beneficial plea promise" that had been made to the witness and that the defense was entitled to rely upon the prosecutor's misleading summation falsely minimizing the promise made to the witness.

212.    In *People v. Jones*, 70 N.Y.2d 547 (1987), the Court of Appeals reversed a first degree narcotics conviction due to the trial prosecutor's "total failure" to deliver interview notes with a key informant which would have revealed significant "discrepancies" in his trial testimony affecting his apparent honesty and overall credibility.

213.    In *People v. Marzed*, 161 Misc.2d 309 (Crim. Ct., New York Co. 1993), the court overturned a weapons conviction because the prosecutor had failed to disclose that the crucial prosecution witness, a police officer, was under investigation for perjury in another gun possession case. While the court made no finding that the trial prosecutor had actually known this information, if he had not, it would have been because of the Office's indifference to its obligation to ensure that such information was disseminated to prosecutors handling cases in which the officer under investigation was a prosecution witness.

214.    Indeed, another court decision revealed that this was the Office's high-level policy.    .
In *People v. Curry*, 164 Misc.2d 969 (Sup. Ct., New York Co. 1995), a Supreme Court justice overturned still another drug conviction, even though the defendant had pleaded guilty, because the District Attorney's Office had deliberately kept the prosecutor handling the case, and therefore the defense, in the dark about a corruption investigation of the arresting officer for stealing money —

exactly what the defendant claimed the officer had done in his case. The decision reveals that, on May 13, 1993, the People had misrepresented to the defense that it had no *Brady* material regarding the case, had then induced the defendant to plead guilty to a reduced charge, and after its failure to disclose the officer's corruption was revealed, defended the conviction. The court held: "In a case which will admittedly hinge on a credibility contest between the defendant and the officer, the withholding of the information at issue does not comport with due process."

215. Notwithstanding the *Marzed* and *Curry* decisions, the Office's policy to withhold that their police witnesses were under criminal investigation continued. In *People v. Williams*, 7 N.Y.3d 15 (2006), a *Brady* violation occurred at a pretrial suppression hearing, conducted in 2002, when the assigned prosecutor was kept in the dark by others in the office about a perjury investigation of the only witness, a police officer, in a contemporaneous, similar, but unrelated case. When the assigned prosecutor learned the information, he still wrongfully withheld it. Disclosure was made only when the defense subpoenaed the witness to testify for the defendant at the trial. Although the Court of Appeals upheld the hearing judge's decision to allow the People to reopen the suppression hearing and rely on a different witness, it condemned the prosecution's behavior: "There was no excuse for the People's failure to make the hearing judge aware of the perjury investigation of [the witness] – at the same time that the People were asking the hearing judge to rely on [the witness's] testimony to deny suppression. At best, the People now concede, they were guilty of a significant misjudgment."

216. In *People v. Jackson*, 237 A.D.2d 179 (1st Dept. 1997), the Appellate Division, citing *Brady*, vacated a 1992 attempted murder conviction because of the prosecution's failure to turn over police reports that the defense had "specifically requested" which were "significantly at variance

with the prosecution's evidence at trial and were clearly evidence that was favorable to the accused." Difficulties the District Attorney's office had with obtaining the reports from the Internal Affairs Division of the Police Department was no excuse.

217.    In *People v. Gantt*, 13 A.D.3d 204 (1st Dept. 2004), the Appellate Division affirmed a lower court decision vacating the defendant's 2001 murder conviction due to the prosecution's failure to disclose the prior inconsistent statement of its main witness, a career criminal who had waited six years to come forward, which called into question his claim that he witnessed the shooting.

218.    In *People v. Sinha*, 84 A.D.3d 35 (1st Dept.), *lv. to app. granted*, __ N.Y.3d __, 922 N.Y.S.2d 275 (2011), the Appellate Division reversed a 2007 bribery conviction in the interest of justice "because the prosecution failed to fulfill basic disclosure obligations that are essential to a fair trial," including withholding e-mails to a witness's mother containing extravagant promises of consideration if her son would cooperate and revealing benefits he already had received, as well as other information bearing upon the witness's motive to lie and criminal history. The court wrote: "The trial court correctly characterized the tardy disclosure of the e-mails as 'inexcusable.' We add that for the prosecution to fail in three distinct respects to fulfill its disclosure obligation is intolerable."

219.    In *People v. Ortiz*, 85 A.D.3d 588 (1st Dept. 2011), the Appellate Division, for the second time, reversed the defendant's conviction for criminal facilitation of murder. The first conviction, after a full trial in 2002, had been reversed for pervasive misconduct by the prosecutor. *People v. Ortiz*, 33 A.D.2d 432 (1st Dept. 2006). The second conviction was reversed because the prosecution had convinced the trial judge to deny the defense permission to use reports of the District

Attorney's Office to contradict the crucial testimony of an assistant district attorney because it was unclear whether the same ADA had been the author of the reports. However, two justices, in a concurring opinion, found that the conviction also should have been reversed for a *Brady* violation. The violation was the failure to disclose still another document which proved that the reports in question in fact had been authored by the same ADA-witness.

220. During the periods preceding and following Plaintiff's conviction, there were additional unpublished findings by lower courts of *Brady* and related discovery violations, as well as credible allegations of such violations which did not result in reversals of convictions on that specific basis.

221. In numerous other cases involving trials that occurred prior to or at approximately the same time as Plaintiff's trial, convictions were reversed where prosecutors had failed to disclose *Rosario* material that was likely to contain information impeaching the credibility of significant prosecutions witnesses or to correct false testimony or argument (and thus most likely *Brady* violations occurred as well). *See*:

> *People v. Watkins*, 189 A.D.2d 623 (1ˢᵗ Dept. 1993) (drug conviction reversed for prosecutor's failure to disclose officer's notes containing "important impeachment material");
>
> *People v. Jackson*, 174 A.D.2d 552 (1ˢᵗ Dept. 1991) (conviction reversed in the interest of justice where prosecutor falsely represented at a conditional hearing that all *Rosario* material had been disclosed while not disclosing until after the witness had been deported his initial, three-page statement to police);
>
> *People v. Green*, 140 A.D.2d 213 (1ˢᵗ Dept. 1988) (prosecutor failed to disclose handwritten police report and then misrepresented in summation that it confirmed the officer's testimony when in fact it contradicted it);

*People v. Quinones*, 139 A.D.2d 404 (1st Dept. 1988) ("incomprehensible" failure by prosecutor to disclose various police documents, including one that undercut possession of stolen property charge).

*See also*:

*People v. Thompson*, 71 N.Y.2d 918 (1988) (burglary and sodomy conviction reversed where prosecution sandbagged defense by holding back key document that undermined defense strategy);

*People v. Dixon*, 209 A.D.2d 274 (1st Dept. 1994) (1990 murder conviction reversed for prosecutor's inexcusable failure, despite "repeated defense requests," to disclose police notes);

*People v. West*, 185 A.D.2d 160 (1992) (failure to disclose police report plainly required to be disclosed under Court of Appeals' precedent);

*People v. Dennis*, 265 A.D.2d 271 (1st Dept. 1999) (reversing 1988 murder conviction because of prosecutor's failure to disclose and to preserve detective's handwritten notes which he used to refresh his recollection during his pretrial hearing testimony);

*People v. Jordan*, 207 A.D.2d 700 (1st Dept. 1994) (reversing 1991 drug conviction because prosecution "prejudiced" the defense by failing to disclose police notes relating "directly to the primary issues contested at trial"); and

*People v. Jennings*, 248 A.D.2d 265 (1st Dept. 1998) (reversing 1994 narcotics conviction where prosecutor inexcusably failed to disclose a significant police report).

222.    In numerous other cases, convictions were reversed for misconduct by the prosecutor, as in Plaintiff's case, in improperly vouching for the credibility of the People's witnesses and thereby denying the defendant his constitutional right to a fair trial, for providing "testimony" in an unsworn manner during the prosecutor's summation, or for overall pervasive misconduct:

*People v. Rivera*, 75 A.D.2d 544 (1st Dept. 1980) (prosecutor's summation was a "blatant appeal to prejudice" and to "inflame the

passions of the jurors"; she persisted notwithstanding the court's rulings against her; murder conviction overturned even though the evidence was "overwhelming");

*People v. Bolden*, 82 A.D.2d 757 (1ˢᵗ Dept. 1981) (manslaughter conviction reversed due to prosecutor's "improper conduct," including "vouching for the credibility of the People's witnesses");

*People v. Dowdell*, 88 A.D.2d 239 (1ˢᵗ Dept. 1982) (pervasive summation misconduct, including vouching for the lack of motive to lie and honesty of the People's witnesses);

*People v. Grice*, 100 A.D.2d 419 (1ˢᵗ Dept. 1984) (murder conviction reversed for "reprehensible" and "pervasive" misconduct of prosecutor which "permeated" the trial, including "improper vouch[ing] for the credibility of the People's witnesses");

*People v. Bendell*, 111 A.D.2d 878 (1ˢᵗ Dept. 1985) (bribery conviction reversed after the prosecutor repeatedly "became an unsworn witness for the prosecution and impermissibly placed his own veracity as an issue before the jury" during witness examinations and his summation);

*People v. Coates*, 137 A.D.2d 192 (1ˢᵗ Dept. 1988) (murder conviction reversed due to the prosecutor's "flagrant," "arrogant[]," and pervasive misconduct in misstating the evidence and continually violating the court's rulings);

*People v. Hansen*, 141 A.D.2d 417 (1ˢᵗ Dept. 1988) (pervasive summation misconduct; "the prosecutor unfairly injected her own personal views and conveyed her own personal opinion of the case" and "vouched for the credibility of the witnesses");

*People v. Blake*, 139 A.D.2d 110 (1ˢᵗ Dept. 1988) (murder conviction reversed due to "prosecutor's violation of the unsworn witness rule" which bolstered People's case on specific disputed issues);

*People v. Clemons*, 166 A.D.2d 363 (1ˢᵗ Dept. 1990) (robbery/assault conviction reversed due to summation misconduct of prosecutor, which including vouching for his witnesses);

*People v. Norton*, 164 A.D.2d 343 (1ˢᵗ Dept. 1990) (assault conviction reversed due to prosecutor's "exceptionally deplorable" summation

misconduct in which he became an unsworn witness and argued "facts" not in evidence);

*People v. D'Alessandro*, 184 A.D.2d 114 (1st Dept. 1992) (summation misconduct, including vouching, "went beyond the limits of propriety" [but errors found harmless]);

*People v. Tolbert*, 198 A.D.2d 132 (1st Dept. 1993) (assault conviction reversed due to prosecutor's vouching for the complainant's truthfulness and other misconduct);

*People v. Bell*, 191 A.D.2d 361 (1st Dept. 1993) (robbery conviction reversed due to prosecutor's "repetitive and haranguing comments in summation, a practice repeatedly condemned by this court," as well as prosecutor's "vouching for the credibility of one of the police witnesses");

*People v. Nevedo*, 202 A.D.2d 183 (1st Dept. 1994) (1991 robbery conviction reversed due to prosecutor's inflammatory comments in summation; court finds it "frustrating and distressing to have to reverse the conviction of a defendant who the evidence shows is almost certainly guilty of very serious and violent crimes," causing the "utter waste" of the time of "judge, jurors, witnesses and court personnel, ... all because a prosecutor was overzealous in his quest for a conviction");

*People v. Collins*, 12 A.D.3d 33 (1st Dept. 2004) (2002 drug conviction reversed due to "catalogue of prosecutorial improprieties committed during summation" including vouching and arguing "facts" not in evidence);

*People v. Ortiz*, 33 A.D.3d 432 (1st Dept. 2006) (2002 murder conviction reversed due to prosecutor's pervasive misconduct on cross-examination and during summation including "repeatedly vouch[ing]");

*People v. Moye*, 52 A.D.3d 1 (1st Dept. 2008), *aff'd*, 12 N.Y.3d 743 (2009) (drug conviction reversed due to prosecutor's "egregious violation of the unsworn witness" and vouching rules by reference to his own pretrial conduct and credibility).

223. Prior to Plaintiff's trial, the New York County D.A.'s Office also had a history of

withholding exculpatory information, as in Plaintiff's case, tending to demonstrate the defendants' innocence. In *People v. Lee Earl Johnson*, Ind. No. 657/74 (Sup. Ct., New York Co.), reported at 173 N.Y.L.J. 15 (5/22/75). Justice McQuillan decried as "misconduct ... [that] shocks the conscience" the prosecutor's 14-month failure to disclose his interviews with two witnesses who completely exculpated the defendant, and then off-handedly disclosing the witnesses when it was too late for the defense to fully investigate their information. Acquitting the defendant at a non-jury trial, Justice McQuillan called the prosecutor's "explanation to the court for his nonfeasance ... sheer hogwash," and admonished the District Attorney's Office as follows:

> The district attorney, as a quasi-judicial officer, seeks justice and not convictions. Thus, a prosecutor's staff must combine a strong sense of fairness with a high degree of professional expertise. Errors in judgment that are the product of inexperience or ineptness can be minimized by proper training and supervision. Such measures, particularly effective oversight, could have avoided the overreaching that occurred in this case. The district attorney and his bureau chiefs have an obligation to carefully train and closely supervise the work of the younger and less experienced staff members. If this case reflects the kind of training and supervision done, then corrective measures are obviously promptly required.

224. In *People v. Hunter*, 126 Misc.2d 13 (Sup. Ct., New York Co. 1984) (Atlas, J.S.C.), the court dismissed an indictment for grand larceny because the prosecutor, in violation of the defendant's Federal due process rights, had withheld from the defendant, during grand jury proceedings, the statement of a witness that proved the defendant's absolute innocence.

225. In *People v. Porter*, 128 A.D.2d 248 (1st Dept. 1987), a narcotics case, the Appellate Division directed a hearing into the materiality of a police report that supported the defense that the drugs were found in a third person's, not the defendant's, possession. The court concluded that the disclosure violation was, at a minimum, "regrettable," but if committed knowingly, represented a

"disturbing error in judgment."

226.    In *People v. Davis*, 81 N.Y.2d 281 (1993), the Court of Appeals reversed a 1988 assault and robbery conviction where the prosecutor had knowingly misled the defense and the jury about information which, if accurately disclosed, would have supported the defense that the People's identification witness had misidentified another alleged perpetrator. The Court found "especially troublesome" the prosecutor's misleading summation discounting that any such misidentification had occurred.

227.    In *People v. Bermudez*, 25 Misc.3d 1226(A), 2009 WL 3823270 (Sup. Ct., New York Co. Nov. 9, 2009), the court overturned a false murder conviction obtained by the New York County D.A.'s Office in 1992 having close similarities to Plaintiff's case. The court found that the trial prosecutor had known, but had failed to reveal, that the key accomplice witness had indicated that an individual other than the defendant was the shooter, had failed to correct the witness's false testimony, and had made false summation arguments advocating the witness's credibility. Additionally, the prosecutor had "testified" in summation as an unsworn "witness" to explain why the witness had not been charged as an accessory to the crime. Condemning the District Attorney's continued opposition to vacating the conviction after a wrongfully convicted man had spent nearly 18 years in prison, the court concluded: "The People's position that this court should uphold a conviction based [o]n materially false testimony is untenable in our system of justice ..."

228.    In *People v. Ennis*, 41 A.D.3d 271 (1st Dept. 2007), the Appellate Division held under *Brady* that the prosecutor at the 2001 trial should have disclosed an uncalled witness's statement that someone other than the defendant was the perpetrator of the shooting. While the Court of Appeals upheld the denial of a new trial, it, too, concluded that the prosecutor's failure to disclose the

49

statement, made directly to him, "cannot be condoned." 11 N.Y.3d 403, 414 (2008).

229. Upon information and belief, none of the prosecutors who were responsible for the misconduct that occurred in the aforementioned cases were disciplined by the District Attorney's Office or referred for discipline by any outside body such as the Appellate Division's Disciplinary or Grievance Committees.

230. Indeed, the New York County District Attorney, during all relevant times, had no employee handbook, manual, or other document setting forth any disciplinary process for such misconduct, or potential sanctions for them, nor was any such process made known to employees in some other manner as a deterrent to such misconduct. The knowledge that there would be no personal consequence for violations of the due process and fair trial rights of criminal defendants encouraged prosecutors, including Plaintiff's prosecutor, to commit such violations.

231. The District Attorney's policy, custom and/or practice of approval or ratification of, toleration or acquiescence in, or deliberate indifference to, violations of his Office's constitutional obligations foreseeably encouraged such violations to continue and was a substantial cause of the violations of Plaintiff's constitutional rights before and during his trial, his wrongful conviction, and the continuation thereafter of his wrongful imprisonment and prosecution.

232. The foregoing violations of Plaintiff's federal constitutional rights and resultant injuries were directly, foreseeably, proximately, and substantially caused by conduct, chargeable to Defendant City of New York, amounting to deliberate indifference to the constitutional rights of persons, including Plaintiff, subject to prosecution by the New York County District Attorney's Office, namely:

(a) the institution and implementation of plainly inadequate or unlawful policies,

procedures, regulations, practices and/or customs concerning:

    i.     the duty not to use false, misleading or unreliable evidence, testimony, statements or argument during criminal proceedings;

    ii.     the continuing obligation to correct false, inaccurate, incomplete or misleading evidence, testimony, statements and argument, whenever such misconduct is discovered to have occurred;

    iii.     the continuing duty to obtain, to preserve, and to make timely disclosure to the appropriate parties, including the court and the defense, during criminal investigations and prosecutions, all material evidence or information favorable to a person suspected, accused or convicted of criminal conduct, including exculpatory evidence as well as evidence impeaching the credibility or undercutting the reliability of prosecution witnesses, and including verbal as well as recorded information; and

    iv.     the duty to refrain from coercing or manufacturing false or inherently unreliable statements and testimony from witnesses;

    (b)     the failure to adequately instruct, train, supervise, and discipline their employees with respect to such matters.

233. The aforesaid deliberate or *de facto* policies, procedures, regulations, practices and/or customs (including the failure to properly instruct, train, supervise and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the Defendant City, including, but not limited to, the District Attorney of New York County and his delegates, who knew:

    a)     to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

    b)     that such issues either present employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of employees mishandling such situations as well as the incentives that employees have to make the wrong choice; and

51

c) that the wrong choice by municipal employees concerning such issues will frequently cause the deprivation of the constitutional rights of an accused and cause him constitutional injury.

234. The aforementioned policymaking officials had the knowledge alleged in the preceding paragraph, based upon, among other circumstances:

a) numerous credible allegations, many substantiated by judicial decisions, that police officers and ADAs had violated their *Brady* and related disclosure obligations, had presented or failed to correct false or misleading testimony and argument, and/or had improperly coerced false or inherently unreliable statements or testimony from witnesses;

b) numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Divisions, discussing the difficult issues that regularly arise under the *Brady* rule and the failures of prosecutors in New York State, including in New York County, to comply with that rule;

c) judicial decisions putting the New York County District Attorney on notice that the City could be held liable for its failure to adequately train, supervise, or discipline ADAs regarding their *Brady* and related due process obligations, *see, e.g., Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992); *Ramos v. City of New York*, 285 A.D.2d 284, 729 N.Y.S.2d 678, 692-96 (1st Dept. 2001);

d) the inherent obviousness of the need to train, supervise and discipline ADAs in their aforementioned constitutional obligations to counteract the inherent pressure on prosecutors to obtain convictions.

235. Despite this knowledge, the supervisory and policymaking officers and officials of the Defendant City perpetuated, or failed to take preventative or remedial measures to terminate, said policies, procedures, regulations, practices and/or customs, and did not effectively instruct, train, supervise or discipline their personnel with regard to the proper constitutional and statutory requirements in the exercise of their authority, but instead ratified, sanctioned or tolerated the policies, procedures, regulations, practices and/or customs described above, with deliberate

indifference to the effect of said policies, procedures, regulations, practices and/or customs upon the constitutional rights of residents and citizens of the City and the State of New York.

236. The aforesaid policies, procedures, regulations, practices and/or customs of Defendant CITY were collectively and individually a substantial factor in bringing about the aforesaid violations of Plaintiff's rights under the Constitution and Laws of the United States and in causing his damages.

237. Under the principles of municipal liability for federal civil rights violations, the District Attorney of New York County (or his authorized delegates) has final managerial responsibility for training, instructing, supervising and disciplining attorneys and other employees in his office regarding their conduct in the prosecution of criminal matters, including, but not limited to, their obligations not to coerce witnesses or manufacture false or unreliable "evidence," to make timely disclosure of exculpatory or impeachment evidence to the defense, including post-trial, and to refrain from offering, and to correct, false or misleading evidence, testimony, and argument during trial proceedings.

238. The New York County District Attorney, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision and discipline, with respect to his Office's performance of its duties.

239. The District Attorney of New York County at all relevant times was and is an elected officer of New York County, one of the constituent counties of Defendant CITY, the Office was and is funded out of the CITY's budget, and the Office was and is a New York City agency.

240. Furthermore, the District Attorney was and is designated a "local officer," rather than

a "state officer," under the New York Public Officers Law (§ 2); and New York has provided by statute (N.Y. County Law §§ 53, 941) that the CITY's constituent counties (including New York County), and hence Defendant CITY itself, shall have liability for torts committed by County officers and employees, such as the District Attorney and his assistants.

241. The District Attorney of New York County personally and/or through his authorized delegates, at all relevant times had final authority, and constituted a City policymaker for whom the City is liable, with respect to the above-mentioned areas.

242. During all times material to this Complaint, the CITY, through its policymakers, owed a duty to the public at large and to Plaintiff, which such policymakers knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs and practices sufficient to prevent, deter, and avoid conduct by their subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

243. By virtue of the foregoing, Defendant CITY is liable for having substantially caused the foregoing violations of Plaintiff's constitutional rights and his resultant injuries.

## TENTH CAUSE OF ACTION

**(Negligent Hiring, Training and Supervision Under State Law;
Defendants City of New York and NYCHA)**

244. Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1 through 243 of this Complaint.

245. By virtue of the foregoing, defendant City of New York is liable to plaintiff because of its intentional, deliberately indifferent, careless, reckless, and/or negligent failure to adequately

hire, train, supervise, and discipline its agents, servants and/or employees employed by the New York County District Attorney and/or the NYPD with regard to their aforementioned duties.

246. By virtue of the foregoing, defendant NYCHA is liable to plaintiff because of its intentional, deliberately indifferent, careless, reckless, and/or negligent failure to adequately hire, train, supervise, and discipline its agents, servants and/or employees employed by its Police Department with regard to their aforementioned duties.

<u>**DAMAGES DEMAND**</u>

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

a. For compensatory damages of not less than $60 million;

b. For punitive damages against the individual Defendants of $60 million;

c. For reasonable attorneys' fees, together with costs and disbursements, pursuant to 42 U.S.C. §1988 and to the inherent powers of this Court;

d. For pre-judgment interest as allowed by law; and

e. For such other and further relief as this Court may deem just and proper.

LAW OFFICES OF JOEL B. RUDIN

BY: JOEL B. RUDIN, ESQ. (JR 5645)
200 West 57th Street, Suite 900
New York, New York 10019
(212) 752-7600
Email: jbrudin@aol.com

*ATTORNEY FOR THE PLAINTIFF*

55

To:     Corporation Counsel of the City of New York
        Law Department, New York City Housing Authority
        All Defendants


Dated:  New York, New York
        June 25, 2012

# EXHIBIT A

<u>Exhibit A</u>

*Ortiz v. City of New York*, Bronx Co. Index Number _____

<u>Judicial Findings of Wrongful Withholding of Evidence Favorable
To Defense Where Police Officers Were Not Disciplined</u>

1. *People v. Cortez*, 149 Misc.2d 886 (Sup. Ct. Kings Co. 1990): Police violated "spirit" of *Brady* by intentionally destroying a tape they were ordered by the court to preserve. The court found that the D.A.'s office shared responsibility and the indictment was dismissed.

2. *People v. Moss*, 176 A.D.2d 826 (2d Dept. 1991): Conviction reversed for police officer's loss and/or destruction of contemporaneous description of the defendant.

3. *People v. Clausell*, 182 A.D.2d 132 (2d Dept. 1992): Police failed to disclose buy report with description of suspect that was inconsistent with officer's testimony. New trial ordered for *Brady* violation.

4. *People v. Nikollaj*, 155 Misc.2d 642 (Sup. Ct. Bronx County 1992): New trial ordered for *Rosario* violations where police failed to turn over numerous inconsistent statements of complainant officers. Court also criticized police for placing defendant in a lineup consisting of Bronx police officers as fillers, despite fact that complainants were also Bronx police officers.

5. *People v. Dunn*, 185 A.D.2d 54 (1st Dept. 1993): Conviction reversed in part where, among other things, police detective destroyed interview notes.

6. *People v. Morrow*, 204 A.D.2d 356 (2d Dept. 1994): Conviction reversed where a significant portion of police report was not disclosed.

7. *People v. White*, 200 A.D.2d 351 (1st Dept. 1994): Conviction reversed where DD5 containing *Brady* and *Rosario* material was not disclosed, and only was discovered through defendant's post-conviction FOIL request to the NYPD and Bronx DA's Office.

8. *People v. Anderson*, 222 A.D.2d 442 (2d Dept. 1995): Conviction reversed where scratch notes lost or destroyed due to officer's "lack of due care."

9. *People v. Brogdon*, 213 A.D.2d 418 (2d Dept. 1995): Conviction reversed where notes made by NYPD sergeant were withheld from defendant, and where identification by undercover "cannot be said as a matter of law" to have been "merely confirmatory and not suggestive."

10. *People v. Joseph*, 86 N.Y.2d 565 (1995): Adverse inference instruction appropriate where police deliberately destroyed interview notes.

11. *People v. White*, 232 A.D.2d 436 (2d Dept. 1996): Conviction reversed due to loss of police officer's memo book through lack of due care, where there was a serious identification issue, and defendant was prejudiced by his inability to cross-examine officer using missing memo book.

12. *People v. Gallman*, 240 A.D.2d 512 (2d Dept. 1997): Conviction reversed for failure to disclose notes of police interview with a key witness; officer's typewritten notes were not duplicative equivalent because they contained "variations".

13. *People v. Jackson*, 237 A.D.2d 179 (1st Dept. 1997): Conviction reversed for *Brady* violation consisting of the withholding by the police of internal affairs reports that contained entries that significantly were at variance with prosecution's evidence at trial and were favorable to defendant.

14. *People v. Branch*, 175 Misc.2d 933 (Sup. Ct. Kings County 1998): People successfully fought motion to vacate judgment based upon confession of real killer; conviction overturned in 2002 after key prosecution witness recanted and said police paid him for his cooperation.

15. *People v. Cannon*, 191 Misc.2d 136 (Sup. Ct. Kings Co. 2002): Motion to vacate conviction denied, but Brooklyn D.A.'s office and NYPD warned of future sanctions if the police continue policy of destroying or failing to preserve evidence.

# EXHIBIT B

<u>Exhibit B</u>

*Ortiz v. City of New York,* Bronx Co. Index Number _____

<u>Police Misconduct Lawsuits Settled by New York City For
Substantial SumsWhere The Individual Police Officers
Responsible Were Not Disciplined</u>

1.     *Hart v. City of New York,* 186 A.D.2d 398 (1st Dept. 1992): Jury finds that police falsely arrested and maliciously prosecuted plaintiff, and awards $550,000 in compensatory and punitive damages. Appellate court upholds that finding, concluding there was "sufficient evidence to support the jury's finding that the arresting officer had knowingly provided false testimony to the Grand Jury resulting in plaintiff's indictment and incarceration." *Id.* at 399.

2.     *Tong v. City of New York, et al.,* 95-CV-7965 [S.D.N.Y., settled 10/4/95, $35,000]: Complaint alleged police fabricated evidence against, and maliciously prosecuted, Plaintiff, and that the NYPD failed to train or supervise its officers in those areas. Plaintiff was arrested without probable cause, stripped searched, and falsely accused of driving with a suspended license. One of the traffic violations against the plaintiff was later dismissed.

3.     *Dabbah v. City of New York, et al.,* 95-CV-2952 [S.D.N.Y., settled 3/12/96, $35,000]: Complaint alleged police fabricated evidence against, and maliciously prosecuted, Plaintiff. Plaintiff was arrested without probable cause on disorderly conduct charges and police swore to false affidavits converting the criminal complaint to an information. Eight months later, the charges were dismissed on the People's motion.

4.     *Boland v. City of New York, et al.,* 93-CV-5058 [E.D.N.Y., settled 8/6/96, $30,000]: Complaint alleged police maliciously prosecuted Plaintiff. Plaintiff was stopped, interrogated, arrested without probable cause, and held in custody for two nights. Supervising police officers failed to order Plaintiff's release and permitted him to be falsely prosecuted.

5.     *Kadlub v. City of New York, et al.,* 95-CV-1080 [E.D.N.Y., settled 12/11/96, $34,000]: Complaint alleged police maliciously prosecuted plaintiff and that the NYPD failed to train or supervise its officers in that area. Plaintiff was arrested without probable cause on drug possession and sale charges after he declined a stranger's offer of drugs. The charges against Plaintiff were later dismissed.

6.     *Castro v. City of New York, et al.,* 94-CV-5114 [S.D.N.Y., settled 3/18/97, $72,500]: Complaint alleged police maliciously prosecuted plaintiff. Plaintiff was arrested on weapon possession charges without probable cause. The charges were dropped after Plaintiff was held in custody for several hours. The police had refused to release Plaintiff, stating that if the arrest was in error, Plaintiff could "always sue the City,

[because] they got a lot of money."

7.    *McCaskill v. City of New York, et al.*, 96-CV-3687 [E.D.N.Y., settled 7/10/97, $100,000]: Complaint alleged police maliciously prosecuted Plaintiff. Plaintiff was arrested for disorderly conduct without probable cause. Police issued a false summons and approximately 6 months later, the charges against Plaintiff were dismissed.

8.    *Gurley v. City of New York, et al.*, 95-CV-2422 [E.D.N.Y., settled 8/21/97, $1,7500,000]: Complaint alleged police falsely arrested, maliciously prosecuted, and suppressed *Brady* material from Plaintiff, and that the NYPD routinely ratified such conduct, and was deliberately indifferent to its officers' obligation to preserve and disclose such evidence. Plaintiff was wrongfully incarcerated for over 20 years based on, among other things, police concealment of a supplemental ballistics report from the D.A. and Plaintiff, which would have supported Plaintiff's self defense case at trial.

9.    *Gaylock v. City of New York, et al.*, 96-CV-6183 [E.D.N.Y., settled 3/6/98, $90,000]: Complaint alleged police fabricated evidence against, and maliciously prosecuted, Plaintiffs, and that the NYPD failed to train and supervise its officers in those areas. Plaintiffs were arrested without probable cause on weapon charges after police illegally entered their home. The charges were pending for 10 months before being dismissed.

10.    *Gordon v. City of New York, et al.*, 97-CV-8035 [S.D.N.Y., settled 11/12/98, $40,000]: Complaint alleged police maliciously prosecuted Plaintiff. Plaintiff was arrested without probable cause based on false allegations in felony complaint by NYPD officers. The charges dismissed by the D.A. three months after Plaintiff's arrest.

11.    *Perez v. City of New York, et al.*, 98-CV-2331 [S.D.NY., settled 1/16/99, $15,000]: Complaint alleged police maliciously prosecuted Plaintiff. Plaintiff was arrested without probable cause and the court later dismissed the charges.

12.    *Ziehenni v. City of New York, et al.*, 98-CV-3763 [S.D.N.Y., settled 3/5/99, $55,000]: Complaint alleged police fabricated evidence against, and maliciously prosecuted Plaintiff. After Plaintiff disputed a traffic summons and filed a CCRB complaint, police caused false charges to be filed against Plaintiff resulting in his wrongful arrest and incarceration, without probable cause. The charges were ultimately dismissed by the court.

13.    *Napoli v. City of New York, et al.*, 97-CV-1255 [E.D.N.Y., settled 4/9/99, $60,000]: Complaint alleged police fabricated evidence against, and maliciously prosecuted Plaintiff, and that the NYPD failed to train and supervise its officers in those areas. Plaintiff was arrested without probable cause on weapon possession and assault charges based on police officers' false testimony before the grand jury. Plaintiff was later acquitted of all charges.

14.    *Jefferson v. City of New York, et al.*, 98-CV-1097 [E.D.N.Y., settled 4/14/99, $175,000]:

Complaint alleged police falsely arrested, fabricated evidence against, and maliciously prosecuted Plaintiff, and failed to inform the D.A.'s office of *Brady* material establishing Plaintiff's innocence. Plaintiff, a corrections officer, was arrested on weapon and drug charges without probable cause, and police falsely claimed that those weapons and drugs were recovered from Plaintiff's mother's home. Police failed to inform the D.A. that there was no evidence that could justify the charges or Plaintiff's arrest. The charges were ultimately dismissed by a grand jury.

15.    *Denizard v. City of New York, et al.*, 98-CV-423 [E.D.N.Y., settled 6/4/99, $64,000]: Complaint alleged police maliciously prosecuted Plaintiff. Plaintiff, an auxiliary police officer, was arrested without probable cause for disorderly conduct, and resisting arrest. The charges were later dismissed on People's motion.

16.    *Sweazie v. City of New York, et al.*, 99-CV-419 [E.D.N.Y., settled 10/20/99, $20,000]: Complaint alleged police fabricated evidence against Plaintiff, falsely arrested and maliciously prosecuted him on weapons possession charges, and that the NYPD failed to train and supervise its officers in that area, and failed to follow up on relevant civilian complaints made to IAB and CCRB. Plaintiff was illegally stopped, searched, and arrested without probable cause and accused of throwing a gun to the ground. Police falsely swore in a felony complaint and to the grand jury that Plaintiff said he had been holding the gun for a friend. The grand jury dismissed the charges.

17.    *Daniels v. City of New York, et al.*, 00-CV-1981 [S.D.N.Y., settled 3/15/00, $28,500]: Complaint alleged police arrested Plaintiff without probable cause on weapon charges which were dismissed by the court subsequent to Plaintiff's arrest.

18.    *Almonte v. City of New York, et al.*, 99-CV-519 [E.D.N.Y., settled 7/12/00, $30,000]: Complaint alleged police falsely arrested Plaintiff and that the NYPD failed to train or supervise its officers in that area. Plaintiff was arrested without probable cause on drug charges that were later dismissed.

19.    *Fields v. City of New York, et al.*, 99-CV-8130 [E.D.N.Y., settled 7/28/00, $15,000]: Complaint alleged police maliciously prosecuted Plaintiff and that the NYPD failed to train and supervise its officers in that area. Plaintiff was arrested without probable cause while walking down the street. The court dismissed the charges against the Plaintiff.

20.    *Younger v. City of New York, et al.*, 00-CV-836 [S.D.N.Y., settled 9/1/00, $25,000]: Complaint alleged police fabricated evidence against, and maliciously prosecuted Plaintiff. Plaintiff filed an IAB complaint against police after they threatened her with arrest if she did not provide the whereabouts of her boyfriend, a suspect in several burglaries. After Plaintiff filed the complaint, police arrested her without probable cause. The charges against her were later dismissed.

21.    *Lovell v. City of New York, et al.*, 00-CV-0002 [S.D.N.Y., settled 10/20/00, $40,000]: Complaint alleged that the police fabricated evidence against, and maliciously prosecuted

Plaintiff, and that the NYPD failed to train and supervise its officers in that area. The complaint also referenced numerous civilian complaints and the NYPD's failure to meaningfully discipline its officers who commit such acts. The Plaintiff was arrested without probable cause for turnstile jumping based on false statements made by police in a criminal complaint when in fact, Plaintiff had utilized his metrocard. The case against Plaintiff was later dismissed.

22. *Cotto v. City of New York, et al.*, 00-CV-1341 [E.D.N.Y., settled 12/01/00, $30,000]: Complaint alleged police maliciously prosecuted Plaintiff. Plaintiff was arrested without probable cause for possessing and selling a controlled substance. The court later dismissed the charges against Plaintiff.

23. *Coleman v. City of New York, et al.*, 00-CV-2019 [E.D.N.Y., settled 1/2/01, $60,000]: Complaint alleged police falsely arrested and maliciously prosecuted Plaintiffs. Police, without probable cause, arrested Plaintiffs and caused their incarceration for several days. The court later dismissed the charges.

24. *Crespo v. City of New York, et al.*, 93-CV-8847 [S.D.N.Y., settled 8/29/06, $25,000]: Complaint alleged police fabricated evidence against, and maliciously prosecuted Plaintiff, and that the NYPD "fostered a policy to which perjury and the falsification of documents were methods of securing indictments and convictions of innocent individuals." Plaintiff was arrested without probable cause on weapon charges. The police later swore to a false complaint and gave false testimony before the grand jury.

25. *Gallo v. New York City Police Department*, 93 CV 2105 [E.D.N.Y., settled 7/5/94, $13,340]: Complaint alleged police falsely arrested and maliciously prosecuted Plaintiff. Plaintiff was arrested robbery charges without probable cause. The charges were later dismissed.

26. *Gallion v. Detective Pereira, et al.*, 93 CV 5180 [S.D.N.Y., settled 7/18/94, $25,000]: Complaint alleged police falsely arrested and maliciously prosecuted Plaintiff. Plaintiff was arrested for assault without probable cause, and the charges against him were later dismissed.

27. *Lopez and Ravitz v. City of New York*, 93 CV 6516 [S.D.N.Y., settled 1/2/96, $80,000]: Complaint alleged police falsely arrested and maliciously prosecuted Plaintiffs. After urging police not to arrest others, Plaintiffs were arrested without probable cause, unlawfully strip searched, and issued Desk Appearance tickets.

28. *Nakajima and Fancis v. Alamo Rent-a-Car, Inc., et al.*, 94 CV 0857 [E.D.N.Y., settled 6/19/95, $51,000]: Complaint alleged police falsely arrested Plaintiffs. Plaintiffs, while driving in a rental car, were arrested without probable cause despite providing police with valid rental agreement.

29. *Nieves v. City of New York*, 94 CV 1491 [E.D.N.Y., settled 4/25/96, $50,000]: Complaint

alleged police fabricated evidence against, and maliciously prosecuted Plaintiff. Plaintiff, a security officer with the City's Dept. of Business Services, was arrested without probable cause in a baseless drug sweep. Police then concocted a false story to prevent Plaintiff from defending himself at a hearing to revoke his license.

30. *Shabazz, et al. v. Detective Gerald Shisko, et al.*, 94 CV 0029 [E.D.N.Y., settled 4/13/95, $30,000]: Complaint alleged police falsely imprisoned Plaintiffs. Police entered Plaintiffs' premises without probable cause or a search warrant and imprisoned and searched them.

31. *Agnew, et al. v. Bratton, et al.*, 94 CV 6508 [S.D.N.Y., settled 7/23/96, $90,000]: Complaint alleged police falsely imprisoned Plaintiffs and that the NYPD failed to train and supervise its officers in that area. Without a warrant or probable cause, the police entered Plaintiffs' home, detained the occupants, and conducted a search.

32. *Taousse v. City of New York*, 95 CV 7965 [S.D.N.Y., settled 12/4/96, $16,000]: Complaint alleged police fabricated evidence against, and maliciously prosecuted Plaintiff. Plaintiff was falsely arrested without probable cause for violating traffic laws. The charges against him were later dismissed.

33. *Mahase, et al. v. City of New York*, 96 CV 6105 [E.D.N.Y., settled 6/16/00, $75,000]: Complaint alleged Plaintiff was falsely arrested and imprisoned without probable following a traffic accident. The police held Plaintiff for over thirty hours and then issued a Desk Appearance Ticket which the D.A. promptly moved to dismiss.

34. *Martinez v. City of New York*, 96 CV 0289 [E.D.N.Y., settled , 4/12/99, $50,000]: Complaint alleged police fabricated evidence, falsely arrested and maliciously prosecuted Plaintiff. The complaint also referenced 21 other instances in which individuals were victims of similar conduct by the police, but the NYPD failed to discipline the officers who committed that misconduct. Plaintiff was assaulted and arrested without probable cause when police entered her apartment with a battering ram looking for her son. The police then falsely charged Plaintiff with assaulting an officer.

35. *Tomback v. Dear, et al.*, 96 CV 3972 [E.D.N.Y., settled 2/9/98, $20,000]: Complaint alleged police maliciously prosecuted Plaintiff. Plaintiff was arrested without probable cause and the charges were later dismissed by court due to lack of evidence.

36. *Frantino v. City of New York*, 96 CV 3725 [S.D.N.Y., settled 4/15/97, $50,000]: Complaint alleged police falsely arrested and maliciously prosecuted Plaintiffs. Police arrested Plaintiff without probable cause then issued Desk Appearance Tickets that the D.A.'s office ultimately declined to prosecute.

37. *Bradley v. P.O. Lisa Reale, et al.*, 97 CV 4076 [E.D.N.Y., settled 10/14/98, $20,000]: Complaint alleged police falsely arrested and maliciously prosecuted Plaintiff. Plaintiff was pulled over and arrested without probable cause based on a warrant issued for a

another person.

38.  *Sierzputowski and Sulima v. City of New York*, 97 CV 2687 [E.D.N.Y., settled 11/20/97, $55,000]: Complaint alleged police falsely imprisoned and illegally seized Plaintiffs. Plaintiffs were arrested without probable cause while driving a rental car despite producing documentation to police showing that they had in fact rented the car.

39.  *Silver v. City of New York, et al.*, 97 CV 5384 [E.D.N.Y., settled 3/2/99, $40,000]: Complaint alleged police falsely arrested and imprisoned Plaintiff. Plaintiff was arrested without probable cause for child abuse, notwithstanding police officers' knowledge that Social Services had found the abuse allegations unfounded.

40.  *Gager v. City of New York*, 97 CV 4718 [S.D.N.Y., settled 6/1/98, $105,000]: Complaint alleged police fabricated evidence against, and maliciously prosecuted, Plaintiff. The sixty-six year old female plaintiff was arrested without probable cause, thrown to the ground and assaulted, and then falsely charged, after making a comment to police about a recent police shooting.

41.  *Bernard v. City of New York, et al.*, 98 CV 6068 [E.D.N.Y., settled 3/6/00, $36,000]: Complaint alleged police wrongfully arrested Plaintiff. Following a roadside vehicle inspection, Plaintiff was arrested and his car impounded due to lack of a properly affixed VIN. After the D.A.'s office declined to prosecute, police continued to retain Plaintiff's car.

42.  *Dennis v. Leak, et al.*, 98 CV 5355 [E.D.N.Y., settled 5/26/99, $15,000]: Complaint alleged police illegally seized Plaintiff and filed false charges against him. Plaintiff, while walking down the street, was approached by police, assaulted, and arrested without probable cause. Police later fabricated charges that the court ultimately adjourned in contemplation of dismissal.

43.  *Golston v. City of New York*, 98 CV 4206 [E.D.N.Y., settled 10/30/00, $25,000]: Complaint alleged police fabricated evidence and maliciously prosecuted Plaintiff. Plaintiff was arrested without probable cause on false criminal charges that were later dismissed.

44.  *Deluise v. City of New York, et al.*, 98 CV 4535 [S.D.N.Y., settled 3/17/99, $28,000]: Complaint alleged police falsely imprisoned Plaintiff and violated his Fourth Amendment rights. Plaintiff was arrested without probable cause and assaulted by police.

45.  *Lindo v. City of New York*, 98 CV 9066 [S.D.N.Y., settled 11/21/00, $80,000]: Complaint alleged police fabricated evidence against, and maliciously prosecuted, Plaintiff. Plaintiff was arrested without probable cause, assaulted and pepper sprayed. Police then swore to false felony complaint which the D.A.'s office ultimately agreed to dismiss.

46.  *Haygood, et al. v. City of New York, et al.*, 99 CV 0026 [S.D.N.Y., settled 11/29/99,

$32,500]: Complaint alleged police maliciously prosecuted plaintiff. Plaintiff was arrested for, among other things, an outstanding warrant for someone with a different NYSID number, and incarcerated for 16 days until police conceded they had the wrong man. Almost a year later, plaintiff was again arrested on those charges and held a month before he was released.

47. *Udofia, et al. v. City of New York*, 00 CV 4872 [E.D.N.Y., settled 1/4/01, $30,000]: Complaint alleged police maliciously prosecuted Plaintiff. Plaintiff was arrested without probable cause although no complainant pressed charges, and police falsely alleged the it was the D.A. who wanted to pursue the charges. Ultimately, Plaintiff was not prosecuted on the case.

48. *Davis v. City of New York*, 00 CV 387 [S.D.N.Y., settled 1/19/00, $175,000]: Complaint alleged police maliciously prosecuted plaintiff. Plaintiff was arrested without probable cause and spent four months in jail. During plaintiff's criminal trial, the judge found that Plaintiff's arrest was "illegal and outrageous," that he was arrested solely because of his race, and that the police photographing of plaintiff was unlawful.

# EXHIBIT B

# AFFIDAVIT OF SERVICE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX
--------------------------------------------------------------X

ANTHONY ORTIZ.,

                    SUMMONS and
                    COMPLAINT
                    Index No. 305498/12

                    Plaintiff,

                  -against-

THE CITY OF NEW YORK;
THE NEW YORK CITY HOUSING AUTHORITY;
JAMES THEIS, a former detective employed ·
By the New York City Police Department,
JOHN DOE Nos. 1 through 5(whose identities are
Currently unknown to have been detectives and supervisors
With the New York City Police Department). And
MICHAEL CORDELLA (aka) Rambo, a former detective
With the New York City Housing Authority Police
Department, as individuals and in their official capacities,

                    Defendents,
--------------------------------------------------------------X

Received by JOEL RUDIN, Esq. Attorney for the Plaintiff, on the 5th day July 2012 At 10:45 AM. A SUMMONS AND COMPLAINT to be served on JAMES THEIS at ▮▮ ▮▮▮▮▮▮▮▮▮

I CATHIE SHELTON, do hereby affirm that on the 11th day of July 2012 at 8:35 PM I did serve A True Copy of this SUMMONS and COMPLAINT to JAMES THEIS in person at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮(DISCRIPTION) male, white skin, hazel eyes, hair blonde grey, between 55-65 years of age, height 6"-6"2, weight 190 to over 200 lbs..

I certify that I have no interest in the above action, am of legal age and reside at ▮▮▮ ▮▮▮▮▮▮▮▮▮and have proper authority in the jurisdiction in which this service was made. Pursuant to N.Y. Statues under penalties of perjury, I declare that I have read the forgoing document and that the facts stated are true to the best of my knowledge and belief.

NOTARY:

LENSKA RODRIGUEZ
NOTARY PUBLIC, STATE OF NEW YORK
NO. 01RO6147462
QUALIFIED IN SUFFOLK COUNTY
COMMISSION EXPIRES JUNE 5, 2014

Cathie shelton

**Cathie Shelton**
Process Server

**JS. INVESTIGATIONS AND ASSOCIATES**
**666 Old Country Road, Suite 700**
**Garden City, NY 11530**

# EXHIBIT C

# AFFIDAVIT OF SERVICE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX
------------------------------------------------------------------X

ANTHONY ORTIZ.,                                    SUMMONS and
                                                    COMPLAINT
                                                    Index No. 305498/12

                        Plaintiff,

                        -against-

THE CITY OF NEW YORK;
THE NEW YORK CITY HOUSING AUTHORITY;
JAMES THEIS, a former detective employed
By the New York City Police Department,
JOHN DOE Nos. 1 through 5(whose identities are
Currently unknown to have been detectives and supervisors
With the New York City Police Department). And
MICHAEL CODELLA (aka) Rambo, a former detective
With the New York City Housing Authority Police
Department, as individuals and in their official capacities,

                        Defendents,
------------------------------------------------------------------X

Received by JOEL RUDIN, Esq. Attorney for the Plaintiff, on the 5th day July 2012 At 10:45 AM. A SUMMONS AND COMPLAINT to be served on MICHAEL CODELLA at ▇▇▇▇▇▇▇▇▇▇▇▇▇

I CATHIE SHELTON, do hereby affirm that on the 9th day of July 2012 at 2:05 PM I did serve A True Copy of this SUMMONS and COMPLAINT to MICHAEL CODELLA in person at ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇(DISCRIPTION) male, white skin, brown eyes, hair brown grey, between 50-55 years of age, height 5"-5"10, weight 150 to 195 lbs.. ·

I certify that I have no interest in the above action, am of legal age and reside at ▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇and have proper authority in the jurisdiction in which this service was made. Pursuant to N.Y. Statues under penalties of perjury, I declare that I have read the forgoing document and that the facts stated are true to the best of my knowledge and belief.

NOTARY:

LENSKA RODRIGUEZ
NOTARY PUBLIC, STATE OF NEW YORK
NO. 01RO6147462
QUALIFIED IN SUFFOLK COUNTY
COMMISSION EXPIRES JUNE 5, 2014

Cathie shelton

**Cathie Shelton**
Process Server

**JS. INVESTIGATIONS AND ASSOCIATES**
**666 Old Country Road, Suite 700**
**Garden City, NY 11530**

# EXHIBIT D

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX
-------------------------------------------------------------------------x
ANTHONY ORTIZ,

                                    Plaintiff,

                                                          **NOTICE OF REMOVAL**

        - against -

THE CITY OF NEW YORK, THE NEW YORK CITY              Bronx County
HOUSING AUTHORITY, JAMES THEIS, a former detective   Index No.: 305498/12
employed by the New York City Police Department, JOHN DOE
Nos. 1 through 5 (whose identities are currently unknown but
who are known to have been detectives and supervisors with the   Law Dep't No. 2012-023973
New York City Police Department), and MICHAEL CODELLA
(aka "Rambo"), a former detective with the New York City
Housing Authority Police Department, as individuals and in their
official capacities,

                                    Defendants.

-------------------------------------------------------------------------x

        **PLEASE TAKE NOTICE**, that a Notice of Removal, a copy of which is

annexed hereto, removing the above-captioned action, which is pending in the Supreme Court of

the State of New York, Bronx County, to the United States District Court for the Southern

District of New York, was filed on July 12, 2012, with the Clerk of said District Court pursuant

to the provisions of 28 U.S.C. § § 1331, 1367(a), 1441 and 1446.

Dated: New York, New York
        July 12, 2012

                                MICHAEL A. CARDOZO
                                Corporation Counsel of the City of New York
                                Attorney for THE CITY OF NEW YORK

                        By:     _____
                                Eric H. West
                                Special Assistant Corporation Counsel
                                100 Church Street – 4th Floor
                                New York, New York 10007
                                (212) 788-0563

## AFFIRMATION OF SERVICE

The undersigned, an attorney admitted to practice in the courts of New York State, shows: that he is employed in the office of the Corporation Counsel of the City of New York, and affirms this statement to be true under the penalties of perjury, pursuant to Rule 2106 CPLR. That on the 12th day of July, 2012, he served the annexed NOTICE OF REMOVAL

upon:
      Law Offices of Joel B. Rudin
      200 West 57th Street, Suite 900
      New York, New York 10019
      phone: 212-752-7600
      fax: 212-980-2968

by depositing a copy of same enclosed in a postpaid wrapper in a post office box situated at 100 Church Street, in the Borough of Manhattan, City of New York, regularly maintained by the government of the United States in said city directed to said attorney in the Borough of Bronx City of New York, being the address within the State theretofore designated for that purpose.

Dated: New York, New York
      June 27, 2012

ERIC H. WEST

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**12 CV 5372**

-------------------------------------------------------------------x

ANTHONY ORTIZ,

                                   Plaintiff,

        - against -

THE CITY OF NEW YORK, THE NEW YORK CITY
HOUSING AUTHORITY, JAMES THEIS, a former detective
employed by the New York City Police Department, JOHN DOE
Nos. 1 through 5 (whose identities are currently unknown but
who are known to have been detectives and supervisors with the
New York City Police Department), and MICHAEL CODELLA
(aka "Rambo"), a former detective with the New York City
Housing Authority Police Department, as individuals and in their
official capacities,

                          Defendants-Petitioner.

**NOTICE OF REMOVAL**

Docket
12CV

ECF Case

Bronx County
Index No.: 305498/12



-------------------------------------------------------------------x

        Defendant-petitioner, THE CITY OF NEW YORK, ("Petitioner"), by its attorney,

Michael A. Cardozo, Corporation Counsel of the City of New York, upon information and belief,

respectively petitions this Court, pursuant to 28 U.S.C. §§ 1331, 1367(a) and 1441, as follows:

        1.     On June 26, 2012, Plaintiff ANTHONY ORTIZ ("Plaintiff") commenced the

above-captioned civil action which is currently pending in the Supreme Court of the State of

New York, Bronx County, of which a trial has not yet been had therein. A copy of the Summons

and Complaint is annexed hereto as Exhibit A.

        2.     On the same date, Petitioner received service of a copy of Plaintiff's Summons

and Complaint, and, on July 11, 2012, an Answer was duly interposed on behalf of Petitioner. A

copy of the Answer is annexed hereto as Exhibit B.

        3.     The within action seeks monetary damages for injuries suffered by Plaintiff due to

his malicious prosecution, wrongful conviction, and nearly 20-year imprisonment, alleged to

have been the result of the misconduct of the New York police detectives and assistant district attorney. See ¶¶ 1-5 of Exhibit A.

4. The Complaint alleges Constitutional injuries to have been substantially caused to Plaintiff as a result of Defendants' negligence and intentional torts, as well as alleged violations of 42 U.S.C. §§ 1983 and § 1988, as a direct the result of custom and/or policies adopted by Petitioner.

5. Accordingly, this is an action over which the District Courts of the United States have original jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. §1441. See, Pastures v. Allied Barton Sec. Servs., 2011 U.S. Dist. LEXIS 151782 (S.D.N.Y. 2011). See, 28 U.S.C. § 1331 (district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.).

6. Furthermore, since the state law claims within Plaintiff's Complaint all arise out of a common nucleus of operative facts, namely, the allegedly condoned police conduct involved during Plaintiff's arrest and subsequent prosecution, both state and federal claims form part of the same case or controversy under Article III of the United States Constitution, and this Court's exercise of supplemental jurisdiction is appropriate here. See, Rosario v. Amalgamated Ladies' Garment Cutters' Union, 605 F.2d 1228, 1247 (2d Cir. 1979) (both state and federal claims were linked by the hostility of Union officials toward appellees' assertion of their § 101 rights); see also, Dunlop v. City of New York, 2006 U.S. Dist. LEXIS 72315 (S.D.N.Y. 2006) (plaintiff's state and federal claims arise out of a common nucleus of operative facts).

7. Plaintiff's Complaint seeks an amount in excess of the jurisdictional limits of all lower courts.

8. This Notice of Removal is filed within thirty (30) days after receipt by Petitioner of the Plaintiff's Complaint.

9. Attached to this Notice, and by reference made a part hereof, are true and correct copies of all pleadings filed herein.

10. By filing this Notice of Removal, petitioner does not waive any defense which may be available to it, specifically including, but not limited to, its right to contest in personam jurisdiction over Petitioner, improper service of process and the absence of venue in this Court or the Court from which this action has been removed.

11. Attorneys for the co-defendant THE NEW YORK CITY HOUSING AUTHORITY have been contacted, and have provided written consent to this removal. A copy of the Consent is annexed hereto as Exhibit C.

12. Upon information and belief, as of 2004, both individually named co-defendants JAMES THEIS and MICHAEL CODELLA, had retired from their official posts, and have not been served a copy of the Complaint at the time the removal petition is filed. As the state court has yet to acquire jurisdiction over co-defendants, their consent to this removal is not required. See, Pacific Westeel Racking, Inc. v. Evanston Ins. Co., 2008 U.S. Dist. LEXIS 11053, 11055 (S.D.N.Y. 2008) (one exception to the Rule of Unanimity is where the non-joining defendants have not been served with service of process at the time the removal petition is filed).

13. Lastly, in the context of 28 U.S.C. § 1441(a), the requirement of unanimity does not extend to unserved, let alone unidentified "JOHN DOE" defendants. Varela v. Flintlock Constr., Inc., 148 F. Supp. 2d 297 (S.D.N.Y. 2001); see also, Bowen v. Home Depot, 2001 U.S. Dist. LEXIS 12100 (E.D.N.Y. 2001).

WHEREFORE, the Petitioner respectfully requests that the instant action now pending before Supreme Court of the State of New York, Bronx County, be removed to the United States District Court of the Southern District of New York, and for such other and further relief as this Court deems proper and just.

Dated: New York, New York
       July 11, 2012

MICHAEL A. CARDOZO,
Corporation Counsel of the City of New York
Attorney for City of New York
100 Church Street
New York, NY 10007
(212) 788-0563

By: _____

ERIC H. WEST (EW3000)
Special Assistant Corporation Counsel

TO:   Law Offices of Joel B. Rudin
      200 West 57th Street, Suite 900
      New York, New York 10019
      phone: 212-752-7600
      fax: 212-980-2968

- 4 -

# EXHIBIT C

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX
-------------------------------------------------------------------x

ANTHONY ORTIZ,

                                        Plaintiff,

         - against -

THE CITY OF NEW YORK; THE NEW YORK CITY HOUSING
AUTHORITY, JAMES THEIS, a former detective employed by the
New York City Police Department, JOHN DOE Nos. 1 through 5
(whose identities are currently unknown but who are known to have
been detectives and supervisors with the New York City Police
Department), and MICHAEL CODELLA (aka "Rambo"), a former
detective with the New York City Housing Authority Police
Department, as individuals and in their official capacities,

                                        Defendants.

-------------------------------------------------------------------x

**AFFIDAVIT OF
CONSENT TO
REMOVAL**

Index #:305498/12

         Patrick J. Lawless, an attorney duly admitted to practice law in the State of New

York, hereby affirms under penalties of perjury pursuant to CPLR 2106:

         1.       I am a member of the Law Offices of Wilson, Elser, Moskowitz, Edelman

and Dicker, LLP, located at 150 East 42nd Street, New York, New York 10017, attorneys for the

defendant the New York City Housing Authority ("NYCHA") in the above-captioned action.

         2.       The New York City Law Department has requested NYCHA's consent to

remove the above matter from the Supreme Court of New York, Bronx County, to the United

States District Court, the Southern District of New York.

         3.       NYCHA hereby consents to the removal of this matter to the United States

District Court, Southern District of New York.

         4.       By Consenting to this Notice of Removal, NYCHA does not waive any

defense which may be available to it, specifically including, but not limited to, its right to contest

in personam jurisdiction, improper service of process, and the absence of venue in this Court or the Court from which this action has been removed.

Dated:      July 10, 2012

_____
Patrick Lawless

# EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x

ANTHONY ORTIZ,

                                       Plaintiff,

               - against -

THE CITY OF NEW YORK, THE NEW YORK CITY
HOUSING AUTHORITY, JAMES THEIS, a former detective
employed by the New York City Police Department, JOHN DOE
Nos. 1 through 5 (whose identities are currently unknown but
who are known to have been detectives and supervisors with the
New York City Police Department), and MICHAEL CODELLA
(aka "Rambo"), a former detective with the New York City
Housing Authority Police Department, as individuals and in their
official capacities,

                        Defendants-Petitioner.

-----------------------------------------------------------------------x

**AMENDED
NOTICE OF REMOVAL**

Docket
12 CV 5372

ECF Case

Hon. Jesse M. Furman,
U.S.D.J.



      Defendant-petitioner, THE CITY OF NEW YORK, ("Petitioner"), by its attorney,

Michael A. Cardozo, Corporation Counsel of the City of New York, upon information and belief,

respectively petitions this Court, pursuant to 28 U.S.C. §§ 1331, 1367(a) and 1441, as follows:

      1.     On June 26, 2012, Plaintiff ANTHONY ORTIZ ("Plaintiff") commenced the

above-captioned civil action which is currently pending in the Supreme Court of the State of

New York, Bronx County, of which a trial has not yet been had therein. A copy of the Summons

and Complaint is annexed hereto as Exhibit A.

      2.     On the same date, Petitioner received service of a copy of Plaintiff's Summons

and Complaint, and, on July 11, 2012, an Answer was duly interposed on behalf of Petitioner. A

copy of the Answer is annexed hereto as Exhibit B.

      3.     The within action seeks monetary damages for injuries suffered by Plaintiff due to

his malicious prosecution, wrongful conviction, and nearly 20-year imprisonment, alleged to

have been the result of the misconduct of the New York police detectives and assistant district attorney. See ¶¶ 1-5 of Exhibit A.

4. The Complaint alleges Constitutional injuries to have been substantially caused to Plaintiff as a result of Defendants' negligence and intentional torts, as well as alleged violations of 42 U.S.C. §§ 1983 and § 1988, as a direct the result of custom and/or policies adopted by Petitioner.

5. Accordingly, this is an action over which the District Courts of the United States have original jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. §1441. See, Pastures v. Allied Barton Sec. Servs., 2011 U.S. Dist. LEXIS 151782 (S.D.N.Y. 2011). See, 28 U.S.C. § 1331 (district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.).

6. Furthermore, since the state law claims within Plaintiff's Complaint arise out of a common nucleus of operative facts, namely, the allegedly condoned police conduct involved during Plaintiff's arrest and subsequent prosecution, both state and federal claims form part of the same case or controversy under Article III of the United States Constitution, and this Court's exercise of supplemental jurisdiction is appropriate here. See, Rosario v. Amalgamated Ladies' Garment Cutters' Union, 605 F.2d 1228, 1247 (2d Cir. 1979) (both state and federal claims were linked by the hostility of Union officials toward appellees' assertion of their § 101 rights); see also, Dunlop v. City of New York, 2006 U.S. Dist. LEXIS 72315 (S.D.N.Y. 2006) (plaintiff's state and federal claims arise out of a common nucleus of operative facts).

7. Attached to this Notice, and by reference made a part hereof, are true and correct copies of all pleadings filed herein.

8. By filing this Notice of Removal, petitioner does not waive any defense which may be available to it, specifically including, but not limited to, its right to contest in personam jurisdiction over Petitioner, improper service of process and the absence of venue in this Court or the Court from which this action has been removed.

9. Attorneys for the co-defendant THE NEW YORK CITY HOUSING AUTHORITY have been contacted, and have provided written consent to this removal. A copy of the Consent is annexed hereto as Exhibit C.

10. At the time of the filing of Petitioner's Notice of Removal on July 12, 2012, it was the undersigned's belief that co-defendant MICHAEL CODELLA had not been served with the Plaintiff's Complaint, and thus his consent was not required.

11. However, on July 13, 2012, the undersigned became aware of new information provided by co-defendant THE NEW YORK CITY HOUSING AUTHORITY that co-defendant MICHAEL CODELLA had previously been served with the Plaintiff's Complaint on or about July 9, 2012.

12. On the same date, the undersigned contacted Ronald Berman, Esq., counsel representing co-defendant MICHAEL CODELLA, regarding his client's written consent to this removal, a copy of which was received on July 20, 2012, and is annexed hereto as Exhibit D.

13. This Amended Notice of Removal is filed within thirty (30) days after receipt by Petitioner of the Plaintiff's Complaint. See, CBS, Inc. v. Snyder, 762 F. Supp. 71, 75 (S.D.N.Y. 1991) (petition for removal may be amended freely within the statutory 30-day period calculated from the date of service of the initial state court pleading).

14. Upon information and belief, as of 1994, co-defendant JAMES THEIS had retired from his official post, and has not been served a copy of the Complaint at the time the removal

petition is filed. As the state court has yet to acquire jurisdiction over co-defendant Theis, his consent to this removal is not required. See, <u>Pacific Westeel Racking, Inc. v. Evanston Ins. Co.</u>, 2008 U.S. Dist. LEXIS 11053, 11055 (S.D.N.Y. 2008) (one exception to the Rule of Unanimity is where the non-joining defendants have not been served with service of process at the time the removal petition is filed).

15. Lastly, in the context of 28 U.S.C. § 1441(a), the requirement of unanimity does not extend to unserved, let alone unidentified "JOHN DOE" defendants. <u>Varela v. Flintlock Constr., Inc.</u>, 148 F. Supp. 2d 297 (S.D.N.Y. 2001); see also, <u>Bowen v. Home Depot</u>, 2001 U.S. Dist. LEXIS 12100 (E.D.N.Y. 2001).

**WHEREFORE**, the Petitioner respectfully requests that the instant action now pending before Supreme Court of the State of New York, Bronx County, be removed to the United States District Court of the Southern District of New York, and for such other and further relief as this Court deems proper and just.

Dated: New York, New York
July 23, 2012

MICHAEL A. CARDOZO,
Corporation Counsel of the City of New York
Attorney for City of New York
100 Church Street
New York, NY 10007
(212) 788-0563

By: _____
ERIC H. WEST (EW3000)
Special Assistant Corporation Counsel

TO:     Law Offices of Joel B. Rudin
        200 West 57th Street, Suite 900
        New York, New York 10019
        phone: 212-752-7600
        fax: 212-980-2968

# EXHIBIT C

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX
-----------------------------------------------------------------x
ANTHONY ORTIZ,

                                    Plaintiff,

            - against -

THE CITY OF NEW YORK; THE NEW YORK CITY HOUSING
AUTHORITY, JAMES THEIS, a former detective employed by the
New York City Police Department, JOHN DOE Nos. 1 through 5
(whose identities are currently unknown but who are known to have
been detectives and supervisors with the New York City Police
Department), and MICHAEL CODELLA (aka "Rambo"), a former
detective with the New York City Housing Authority Police
Department, as individuals and in their official capacities,

                                    Defendants.

-----------------------------------------------------------------x

**AFFIDAVIT OF
CONSENT TO
REMOVAL**

Index #:305498/12

            Patrick J. Lawless, an attorney duly admitted to practice law in the State of New

York, hereby affirms under penalties of perjury pursuant to CPLR 2106:

            1.          I am a member of the Law Offices of Wilson, Elser, Moskowitz, Edelman

and Dicker, LLP, located at 150 East 42nd Street, New York, New York 10017, attorneys for the

defendant the New York City Housing Authority ("NYCHA") in the above-captioned action.

            2.          The New York City Law Department has requested NYCHA's consent to

remove the above matter from the Supreme Court of New York, Bronx County, to the United

States District Court, the Southern District of New York.

            3.          NYCHA hereby consents to the removal of this matter to the United States

District Court, Southern District of New York.

            4.          By Consenting to this Notice of Removal, NYCHA does not waive any

defense which may be available to it, specifically including, but not limited to, its right to contest

in personam jurisdiction, improper service of process, and the absence of venue in this Court or

the Court from which this action has been removed.

Dated:       July 10, 2012

Patrick Lawless



# EXHIBIT D

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX
---------------------------------------------------------------------x
ANTHONY ORTIZ,

                                    Plaintiff,

                                                                    **AFFIDAVIT OF**
        - against -                                                 **MICHAEL CODELLA**

THE CITY OF NEW YORK, THE NEW YORK CITY
HOUSING AUTHORITY, JAMES THEIS, a former detective          Bronx County
employed by the New York City Police Department, JOHN DOE   Index No.: 305498/12
Nos. 1 through 5 (whose identities are currently unknown but
who are known to have been detectives and supervisors with the
New York City Police Department), and MICHAEL CODELLA       Law Dep't No. 2012-023973
(aka "Rambo"), a former detective with the New York City
Housing Authority Police Department, as individuals and in their
official capacities,

                                    Defendants.

---------------------------------------------------------------------x

        **Michael Codella**, being duly sworn, deposes and says:

        1.      I currently reside at 866 Stafford Avenue, Staten Island, New York 10309.

        2.      The New York City Law Department has requested my consent to remove

the above matter from the Supreme Court of New York, Bronx County, to the United States

Southern District of New York.

        3.      I hereby consent to the removal of this case.

        4.      By consenting to this Notice of Removal, I do not waive any defense

which may be available to me, specifically including, but not limited to, my right to contest in

personam jurisdiction, improper service of process, and the absence of venue in this Court or the

Court from which this action has been removed.

                                                            _7/20/12_

Dated:       July 20, 2012

_____
Michael Codella

Sworn to before me this
20 day of July, 2012.

_____
Notary Public

RONALD P. BERMAN
NOTARY PUBLIC, STATE OF NEW YORK
QUALIFIED IN NEW YORK COUNTY
LIC. #02BE4748654
COMMISSION EXPIRES SEPT. 30, 2013

# EXHIBIT F

LAW OFFICES OF

# JOEL B. RUDIN

200 WEST 57TH STREET

SUITE 900

NEW YORK, NEW YORK 10019

TELEPHONE: (212) 752-7600
FACSIMILE: (212) 980-2968
E-MAIL: jbrudin@aol.com

JOEL B. RUDIN

TERRI S. ROSENBLATT
SHIRA L. FELDMAN

JABBAR COLLINS
(Legal Analyst)

July 19, 2012

**Certified Mail/R.R.R.**

County Clerk
Bronx County
851 Grand Concourse
Room 118
Bronx, New York 10451

> Re:    *Ortiz v. City of New York, et al.*
>        Index No.  305498/12

Dear Sir or Madam:

This office represents the Plaintiff in the above referenced action. Enclosed please find Plaintiff's Affidavits of Personal Service of the Summons and Complaint upon Defendants Michael Cordella and James Theis.   Thank you.

Very truly yours,

Terri S. Rosenblatt

TSR/tp
Encls.

# AFFIDAVIT OF SERVICE

SUPREME COURT OF THE STATE OF NEW YORK
<u>COUNTY OF BRONX</u>
-----------------------------------------------------X

ANTHONY ORTIZ.,                                        SUMMONS

                                                       Index No. 305498/12

                        Plaintiff,

            -against-

THE CITY OF NEW YORK;
THE NEW YORK CITY HOUSING AUTHORITY;
JAMES THEIS, a former detective employed
By the New York City Police Department,
JOHN DOE Nos. 1 through 5(whose identities are
Currently unknown to have been detectives and supervisors
With the New York City Police Department). And
MICHAEL CORDELLA (aka) Rambo, a former detective
With the New York City Housing Authority Police
Department, as individuals and in their official capacities,

                        Defendents,
-----------------------------------------------------X

Received by JOEL RUDIN, Esq. Attorney for the Plaintiff, on the 5th day July 2012 At 10:45 AM. A SUMMONS to be served on JAMES THEIS at ▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬

I CATHIE SHELTON, do hereby affirm that on the 11th day of July 2012 at 8:35 PM I did serve A True Copy of this SUMMONS to JAMES THEIS in person at ▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬RIPTION) male, white skin, hair blonde grey, between 55-65 years of age, height 6"-6"2, weight 190 to over 200 lbs.. EYE's HAZEl

I certify that I have no interest in the above action, am of legal age and reside at ▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬and have proper authority in the jurisdiction in which this service was made. Pursuant to N.Y. Statues under penalties of perjury, I declare that I have read the forgoing document and that the facts stated are true to the best of my knowledge and belief.

Cathie shelton

**NOTARY:**

JOYCE E. LEWIS
Notary Public, State of New York
No. 01LE6019916
Qualified in Suffolk County
Commission Expires February 16, 20___

6/27/15

7/12/12

**Cathie Shelton**
Process Server

**JS. INVESTIGATIONS AND ASSOCIATES**
**666 Old Country Road, Suite 700**
**Garden City, NY 11530**

# AFFIDAVIT OF SERVICE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX
-------------------------------------------------------------X

ANTHONY ORTIZ.,                                    SUMMONS

Index No. 305498/12

Plaintiff,

-against-

THE CITY OF NEW YORK;
THE NEW YORK CITY HOUSING AUTHORITY;
JAMES THEIS, a former detective employed
By the New York City Police Department,
JOHN DOE Nos. 1 through 5(whose identities are
Currently unknown to have been detectives and supervisors
With the New York City Police Department). And
MICHAEL CORDELLA (aka) Rambo, a former detective
With the New York City Housing Authority Police
Department, as individuals and in their official capacities,

Defendents,
-------------------------------------------------------------X

Received by JOEL RUDIN, Esq. Attorney for the Plaintiff, on the 5th day July 2012 At 10:45 AM. A SUMMONS to be served on MICHAEL CORDELLA at ██████████

I CATHIE SHELTON, do hereby affirm that on the 9th day of July 2012 at 2:05 PM I did serve A True Copy of this SUMMONS to MICHAEL CORDELLA in person at ████ ████████████████████████DISCRIPTION) male,white, skin,brown hair slight grey, between 49-55 years of age, height 5"8-5"10, weight 161 to 190p lbs. EYES bROwN .

I certify that I have no interest in the above action, am of legal age and reside at ████ ████████████████████ and have proper authority in the jurisdiction in which this service was made. Pursuant to N.Y. Statues under penalties of perjury, I declare that I have read the forgoing document and that the facts stated are true to the best of my knowledge and belief.

Cathie shelton

NOTARY:

JOYCE E. LEWIS
Notary Public, State of New York
No. 01LE6019916
Qualified In Suffolk County
Commission Expires February 16, 20___

6/27/15

Joyce E. Lewis

7/12/12

Cathie Shelton
Process Server

**JS. INVESTIGATIONS AND ASSOCIATES**
**666 Old Country Road, Suite 700**
**Garden City, NY 11530**



Search USPS.com or Track Packages

Quick Tools                Ship a Package        Send Mail        Manage Your Mail        Shop        Business Solutions

# Track & Confirm

GET EMAIL UPDATES        PRINT DETAILS

| YOUR LABEL NUMBER | SERVICE | STATUS OF YOUR ITEM | DATE & TIME | LOCATION | FEATURES |
|---|---|---|---|---|---|
| 70101870009142494949 | | Delivered | July 23, 2012, 2:19 pm | BRONX, NY 10451 | Certified Mail™ |
| | | Notice Left (Business Closed) | July 21, 2012, 3:50 pm | BRONX, NY 10451 | |
| | | Acceptance | July 21, 2012, 3:45 pm | BRONX, NY 10451 | |
| | | Arrival at Unit | July 21, 2012, 9:35 am | BRONX, NY 10451 | |
| | | Depart USPS Sort Facility | July 21, 2012 | NEW YORK, NY 10199 | |
| | | Processed through USPS Sort Facility | July 21, 2012, 1:34 am | NEW YORK, NY 10199 | |

## Check on Another Item

What's your label (or receipt) number?

Find

---

**LEGAL**

Privacy Policy ›
Terms of Use ›
FOIA ›
No FEAR Act EEO Data ›

**ON USPS.COM**

Government Services ›
Buy Stamps & Shop ›
Print a Label with Postage ›
Customer Service ›
Site Index ›

**ON ABOUT.USPS.COM**

About USPS Home ›
Newsroom ›
Mail Service Updates ›
Forms & Publications ›
Careers ›

**OTHER USPS SITES**

Business Customer Gateway ›
Postal Inspectors ›
Inspector General ›
Postal Explorer ›

Copyright© 2012 USPS  All Rights Reserved